Lakeisha THOMAS, Appellant,

v.

Ugochi UZOKA, Appellee.

No. 14–08–00182–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 28, 2009.

Rehearing Overruled July 30, 2009.

Kimberley M. Spurlock, Carrie Holman Westbrook, Humble, Diana L. Faust, Dallas, for appellant.

Eric D. Nielsen, Andy Taylor, for appellee.

Panel consists of Justices YATES and SULLIVAN, and Senior Justice HUDSON.*

## OPINION

KENT C. SULLIVAN, Justice.

This appeal arises from a jury verdict in favor of appellee, Ugochi Uzoka ("Ugochi"), whose husband Onyebu Christopher Ozuka ("Chris") died in a head-on automobile collision. The driver of the other vehicle involved in the accident, appellant Lakeisha Thomas ("Thomas"), pleaded guilty to criminal charges arising from the accident but now brings four issues to challenge the jury's verdict in this corresponding civil action. First, she contends the trial court should have instructed the jury that Chris's non-use of a seat belt amounted to negligence *per se*. Second, she claims that the expert opinions of the two investigating police officers are scientifically unreliable and should have been excluded. Third, she challenges the factual and legal sufficiency of the evidence supporting the jury's findings that she was negligent and that her conduct was ninety-eight percent responsible for Chris's death. Fourth, she argues that the damages awarded by the jury are excessive. We find no merit in these issues. Therefore, we affirm the judgment.

## BACKGROUND

The automobile accident occurred on May 14, 2004. That afternoon, Chris, a taxi-cab driver with Yellow Cab, was proceeding south on Elysian, a four-lane road that uses an eight-inch-high concrete median to divide the two northbound and two southbound lanes. Thomas was driving in the opposite direction, northbound, in a Nissan pickup truck. Allegedly, Thomas's truck came over the concrete median into oncoming traffic, causing a head-on collision with Chris's taxi. Chris, who was not wearing a seat belt, died at the scene from a blunt-force impact to the chest. Thomas was taken to the hospital.

The accident was investigated by the Houston Police Department, and Thomas was charged with, and pleaded guilty to, criminally negligent homicide. She also stipulated to the truth of the State's allegations that she "unlawfully ... cause[d] the death of Onyebu [Chris] Uzoka ... by criminal negligence, namely by failing to control speed, failing to maintain a single lane of traffic and exceeding the posted speed limit."[1]

---

* Senior Justice J. Harvey Hudson sitting by assignment.

1. Capitalization normalized.

Chris's surviving widow, Ugochi Uzoka, sued Thomas for wrongful death. She alleged that Thomas caused the collision by negligently swerving into oncoming traffic. She further accused Thomas of speeding. Thomas denied both allegations, instead claiming that Chris's taxi had crossed the median. She also asserted that, by failing to wear his seat belt, Chris was negligent.

The case proceeded to a jury trial in October 2007. Ugochi produced the expert testimony of two officers with the Houston Police Department, both of whom supported Ugochi's version of the facts. Officer Douglas Ertons ("Ertons"), who conducted the accident investigation, opined that Thomas's vehicle caused the impact by swerving in front of Chris's taxi. Officer Rolando Saenz ("Saenz"), an expert in the field of accident reconstruction, then testified that, according to his calculations, Thomas was driving sixty-eight miles per hour at the time of the collision. The posted speed limit was forty-five miles per hour. Under cross-examination, Thomas admitted that, arising out of this event, she pleaded guilty to a charge of criminally negligent homicide and that she stipulated to the State's specific allegations that she was speeding and that she failed to maintain a single lane of traffic.

Over Ugochi's objection, the trial court submitted Chris's comparative negligence to the jury and permitted Thomas to argue that the failure to wear a seat belt amounted to negligence. However, the court rejected a proposed instruction, requested by Thomas, indicating that the non-use of a seat belt constitutes negligence *per se.*

In its verdict, the jury found both drivers' negligence proximately caused Chris's death. The jury apportioned proportionate responsibility at ninety-eight percent for Thomas and two percent for Chris. To compensate Ugochi for past and future pecuniary loss, mental anguish, and loss of companionship and society, the jury awarded $810,000 in damages. Thomas has timely appealed the judgment.

## NEGLIGENCE *PER SE*

Appellant's second issue, which we address first, deals with Chris's failure to wear a seat belt, in violation of section 545.413 of the Texas Transportation Code. *See* Tex. Transp. Code Ann. § 545.413(a) (Vernon Supp. 2008). Thomas contends that Chris's non-use of a safety belt amounted to negligence *per se* because (1) Chris was in the class of persons that section 545.413(a) is designed to protect, and (2) his injury was of a type that the statute was intended to prevent. *See Perry v. S.N.,* 973 S.W.2d 301, 305 (Tex.1998). Therefore, Thomas asked the trial court to submit the following jury instruction: "The law requires an adult to wear a safety belt while in the front seat of a vehicle during its operation. A failure to comply with this law is negligence in itself."

The trial court refused the requested instruction but submitted Chris's comparative negligence under a broad-form question asking whether the negligence of either party proximately caused Chris's death. Although the jury found Chris negligent, Thomas still appeals the omission of the requested negligence *per se* instruction. However, appellant has not shown that the omission probably caused the rendition of an improper judgment. Therefore, we will overrule her second issue.

### A. Standard of Review

A trial court must submit to the jury any instructions that are proper and necessary to enable the jury to render a verdict. Tex.R. Civ. P. 277. An instruction is proper if it might assist the jury in answering the submitted questions, cor-

rectly states the law,[2] and enjoys support in the pleadings and evidence. *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 228 (Tex.App.-Texarkana 2008, pet. denied). However, the jury should not be burdened with surplus instructions, even those that accurately state the law. *Arocha v. State Farm Mut. Auto. Ins. Co.*, 203 S.W.3d 443, 445 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

■■■ A trial court has considerable discretion to submit necessary and proper jury instructions. *See id.; Wal–Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex.App.-San Antonio 1998, pet. denied). Therefore, we review a trial court's decision to refuse a particular instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex.2006). When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, we are to determine whether the instruction was reasonably necessary to enable the jury to render a proper verdict. *Id.* If so, the refusal to submit a requested instruction will constitute reversible error only if the omission probably caused the rendition of an improper judgment. *Id.*

### B. Harm Analysis

■■ We open our discussion with a brief overview of negligence *per se* and, when submitted, its effect on the jury charge. Generally, negligence *per se* is a common-law tort concept in which a person's expected standard of conduct is defined by a statute instead of the reasonably-prudent-person test usually found in "pure" common-law negligence claims. *See Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex.1997). When negligence *per se* is submitted, the jury is not asked to decide

2. Because of our resolution of this issue, we need not decide whether the requested instruction, which identified the decedent's conduct as potential *negligence* instead of as a *failure to mitigate damages*, correctly stated the law. Here, although Thomas alleged that Chris's non-use of a seat belt exacerbated his injuries and ultimately caused his death, she did not contend that such conduct caused the underlying automobile collision itself. Chris's non-use "merely increase[d] or add[ed] to the extent of the loss or injury occasioned by another's negligence." *See Young v. Thota*, 271 S.W.3d 822, 829 (Tex.App.-Fort Worth 2008, pet. filed) (quoting *Elbaor v. Smith*, 845 S.W.2d 240, 245 (Tex.1992)). Therefore, under a traditional common-law analysis, his conduct arguably should be submitted by a mitigation-of-damages instruction instead of a contributory-negligence question. *See Kerby v. Abilene Christian Coll.*, 503 S.W.2d 526, 528 (Tex.1973) (drawing "sharp distinction" between negligence leading to the accident versus that which merely contributes to the damages sustained).

However, in 1995 the Legislature specifically enacted a proportionate responsibility statute that requires the fact-finder to determine all parties' percentage of responsibility for causing a plaintiff's claimed injuries. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 33.003(a), 33.011(4) (Vernon 2008). Consequently, it may have intended to abolish the common-law distinction between a plaintiff's "occurrence-causing" and "injury-causing" negligence. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 cmt., at 44–45 (2008). Indeed, the statutory language may now mandate the submission exclusively in the context of injury-causing conduct. *See* Tex. Civ. Prac. & Rem.Code Ann. § 33.003(a) ("The trier of fact ... shall determine the percentage of responsibility ... with respect to each person's causing or contributing to cause in any way the *harm* for which recovery of damages is sought[.]") (emphasis added).

In this case, we conclude Thomas has not demonstrated that the omission of the negligence *per se* instruction probably caused the rendition of an improper judgment. *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex.2006). Therefore, we do not reach the issue of how a trial court, in light of *Kerby*, *Elbaor*, and CPRC chapter 33, should properly submit a plaintiff's non-use of a seat belt that was injury-causing but not occurrence-causing.

whether the person acted as a reasonably prudent person would have acted under the same or similar circumstances, because the statute itself identifies the appropriate standard of conduct as a matter of law. *Durham v. Zarcades*, 270 S.W.3d 708, 718 (Tex.App.-Fort Worth 2008, no pet.); *Goode v. Bauer*, 109 S.W.3d 788, 791 (Tex. App.-Corpus Christi 2003, pet. denied) ("The effect of declaring conduct as negligence per se is that the conduct constitutes negligence as a matter of law."). Instead, unless an excuse for the statutory violation is proffered, the jury need decide only (1) whether the statute was violated and, if so, (2) whether the statutory violation was a proximate cause of the injury. *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex.1979); *Durham*, 270 S.W.3d at 719.

 Negligence *per se* is not a separate cause of action that exists independently of a common-law negligence cause of action. *Zavala v. Trujillo*, 883 S.W.2d 242, 246 (Tex.App.-El Paso 1994, writ denied). Rather, negligence *per se* is merely one *method* of proving a breach of duty, a requisite element of any negligence cause of action. *Reynolds v. Murphy*, 188 S.W.3d 252, 267 n. 20 (Tex.App.-Fort Worth 2006, pet. denied) (quoting *Zavala*, 883 S.W.2d at 246). Here, while that specific option was not available to Thomas, the trial court granted her request to submit Chris's non-use of a seat belt through a broad-form negligence question and, in fact, the jury found Chris negligent. Thus, because the requested instruction

would not have produced a different outcome, we cannot conclude that Thomas was harmed by the omission of the requested instruction.[3] *See Mieth v. Ranchquest, Inc.*, 177 S.W.3d 296, 305 (Tex. App.-Houston [1st Dist.] 2005, no pet.) ("[T]he trial court abused its discretion by refusing to submit an instruction on negligence per se. However, because the jury found [the defendant] negligent under the common-law definition, the trial court's error was harmless.").[4]

 Thomas responds that she was harmed by the omission because, had the jury known that the non-use of a safety belt is prohibited by statute, it might have assigned a higher percentage of responsibility to Chris, thereby reducing the amount of Thomas's liability for the damages awarded. *See* Tex. Civ. Prac. & Rem.Code Ann. § 33.012(a) (Vernon 2008). However, as this Court noted in *Patterson v. Landua*, a negligence *per se* instruction does not affect the jury's apportionment of responsibility among various causes of a plaintiff's injuries. No. 14–97–00372–CV, 1998 WL 322693, at *4 (Tex.App.-Houston [14th Dist.] June 18, 1998, pet. denied) (not designated for publication). Negligence *per se* may substitute for proof that *a legal duty was breached;* however, it does not compel the jury to conclude that the statutory violation was a *proximate cause* of the damages claimed. *See Carter*, 584 S.W.2d at 278 (indicating that, even when negligence *per se* is submitted, a jury must still decide whether statutory violation was a

3. Notably, during closing argument, Ugochi did not challenge her opponent's claim that Chris had acted negligently by failing to wear his safety belt. Instead, she argued to the jury that his non-use of a seat belt was not a proximate cause of his death.

4. *See also Patterson v. Landua*, No. 14–97–00372–CV, 1998 WL 322693, at *4 (Tex.App.-

Houston [14th Dist.] June 18, 1998, pet. denied) (not designated for publication) ("In the present case, Patterson obtained the same result as the [negligence *per se* ] instruction would have garnered because the jury ultimately found Landua negligent.... Thus, the refusal to submit the instruction had no effect on the outcome of the trial.").

proximate cause of the claimed damages); *Durham*, 270 S.W.3d at 719.

Because apportionment of responsibility is a subsidiary question that goes to *causation*, it is similarly unaffected by a negligence *per se* instruction. *See* Tex. Civ. Prac. & Rem.Code Ann. § 33.003(a) (Vernon 2008) ("The trier of fact ... shall determine the percentage of responsibility ... with respect to each person's *causing or contributing to cause* ... the harm for which recovery of damages is sought[.]") (emphasis added); *id.* § 33.011(4) (defining "percentage of responsibility" as percentage attributed to each party "with respect to causing or contributing to cause" claimed damages). Therefore, it cannot be said that inclusion of a negligence *per se* instruction would have altered the jury's decision to assign to Thomas ninety-eight percent of the responsibility for causing Chris's death. *See Shupe*, 192 S.W.3d at 580. Accordingly, Thomas has not shown that the absence of the requested instruction probably caused the rendition of an improper verdict. *See* Tex.R.App. P. 44.1(a)(1).

Thomas reminds us that she presented two factual bases for the jury to find Chris negligent: failing to wear a seat belt and driving while distracted. She contends we cannot determine on which ground the jury found Chris negligent and suggests that, in the absence of a negligence *per se* instruction, the jury might have rejected her seat-belt theory and instead faulted Chris under her distracted-driver allegation.[5] She therefore argues that the omission of the requested instruction prevented her from properly presenting this appeal,

*see* Tex.R.App. P. 44.1(a)(2), and asks us to presume harm under *Crown Life Insurance Co. v. Casteel.* 22 S.W.3d 378 (Tex. 2000). We decline to extend *Casteel* under these circumstances.

In *Casteel*, the Texas Supreme Court held that, when a jury bases a finding of liability on one broad-form question that commingles invalid theories of liability with valid theories, an appellate court often cannot determine the effect of the error and therefore should presume harm. *See id.* at 388. It reasoned that, when a broad-form submission contains both valid and invalid legal theories, the jury may have found the defendant liable solely on a legal theory that should not have been submitted. *See id.* at 389. Thus, the defendant may have suffered harm from the improper submission but cannot *prove* it. *See id.* at 388.

However, in this case Thomas has not shown even a *possibility* of harm inasmuch as she received the jury finding she desired, that is, that Chris was negligent, and the requested instruction does not affect the jury's apportionment of responsibility among the parties. *See Shupe*, 192 S.W.3d at 580. Moreover, the Texas Supreme Court has expressly declined to extend *Casteel* to cases like this one. *See Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex.2006).

Therefore, Thomas has not shown that the alleged error probably prevented her from presenting her appeal. *See* Tex. R.App. P. 44.1(a)(2). Accordingly, we overrule appellant's second issue.

---

5. We note Thomas did not object to the submission of both factual theories in one broad-form negligence question. Of course, Texas long ago rejected the use of special-issue practice to allow the granulated submission of every potential factual theory of a legal claim. *See* Tex.R. Civ. P. 277. In fact, the Supreme Court has suggested that, under broad-form submission rules, jurors need not agree on the *same* factual negligence theory as long as they agree to the legally relevant result. *See Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 434 (Tex.2005).

## SUFFICIENCY AND RELIABILITY OF EVIDENCE OF NEGLIGENCE

Appellant's third and fourth issues are related, and we address them together. In her fourth issue, Thomas contends the evidence is legally and factually insufficient to support the jury's findings with respect to negligence, proximate cause, and proportionate responsibility. This sufficiency claim is premised upon her argument—contained in both her third and fourth issues—that the opinions offered by Ertons and Saenz, while supportive of the verdict, constitute "no evidence" because such testimony was unreliable and inadmissible. Thus, before we address Thomas's sufficiency complaint, we must review her challenge to the reliability of both officers' expert testimony. *See Transcon. Ins. Co. v. Crump*, 274 S.W.3d 86, 96 (Tex. App.-Houston [14th Dist.] 2008, pet. filed).

### A. Reliability of Officers' Opinions

Generally, courts review a challenge to the admission of expert testimony under an abuse of discretion standard. *See Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 618 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). However, when a trial court admits expert testimony that is challenged on appeal as constituting "no evidence," as here, we review the reliability of the expert testimony using a *de novo* standard of review. *Transcon. Ins. Co.*, 274 S.W.3d at 96; *Goodyear Tire & Rubber Co. v. Rios*, 143 S.W.3d 107, 113 (Tex.App.-San Antonio 2004, pet. denied).

The trial court is charged with ensuring that expert testimony is based upon a reliable foundation and is relevant to the issues in the case. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex.1998). In deciding the reliability of an expert's methodology and the underlying data, the trial court may consider several non-exclusive factors, including (1) the extent to which the expert's theory has been or could be tested; (2) the extent to which his technique relies upon subjective interpretation; (3) whether his technique has been subjected to peer review and/or publication; (4) the potential error rate for the technique; (5) whether the expert's underlying theories or techniques have been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995). In addition, a trial court may give weight to the expert's skill and experience when appropriate to do so. *See Gammill*, 972 S.W.2d at 726. If there is an analytical gap between the expert's conclusions and the underlying data upon which he relies, his expert testimony may be unreliable and inadmissible. *See id.*

The expert testimony Thomas seeks to exclude came from Ertons and Saenz, and fall into two rough categories. First, both officers testified, on the strength of physical evidence collected at the accident scene, that the collision occurred because Thomas's vehicle cut across the concrete median into oncoming traffic. Second, Saenz determined, using foundational data and measurements gathered by Ertons, that Thomas was speeding at the time of the collision. Hoping to exclude these opinions, Thomas argues that Saenz's opinions were drawn from unreliable foundational data provided by Ertons.

### 1. Crossing the Median

Generally, Thomas insists that Ertons failed to exclude alternative causes for the collision, and that an analytical gap therefore renders his opinions unreliable. *See Robinson*, 923 S.W.2d at 558–59. Specifically, during the course of his inves-

tigation, Ertons interviewed Thomas, who denied that her truck transversed the concrete median. Instead, she claimed that she was driving in her own lane and saw Chris's vehicle driving in *her* lane, but she could not avoid a collision. After examining the accident scene, Ertons rejected Thomas's story and concluded that she, not Chris, crossed the median and caused the accident.

Thomas argues that, before Ertons could offer testimony as an expert, he was obligated to consider and rule out other possible causes for the collision.[6] *See id.* at 559 (holding that expert's failure to rule out other causes of damage rendered his opinion little more than speculation); *Emmett Props., Inc. v. Halliburton Energy Servs., Inc.,* 167 S.W.3d 365, 373–74 (Tex. App.-Houston [14th Dist.] 2005, pet. denied). While we agree with that general proposition, the record indicates that Er-

tons did not overlook Thomas's version of the facts. Instead, he decided that her claim was inconsistent with, and contradicted by, the physical evidence he found at the accident scene.

For example, Ertons found fresh gouge marks in the median south of the impact scene—the direction from which Thomas was traveling—but not north.[7] This finding supported his opinion that, as Thomas's northbound vehicle crossed the median, the underside of her truck scratched the concrete median, leaving behind gouge marks and powdery concrete residue.

Next, Thomas complains that Ertons failed to interview any witnesses to the collision. Of course, this contention presupposes that somebody *in fact* witnessed the accident. However, nobody who claimed to have seen the impact came for-

---

6. In a related argument, Thomas contends that Ertons improperly ignored evidence favorable to her claim. For example, she interprets an in-car photograph, apparently taken before the collision, as depicting Chris staring at an off-the-screen object—which she speculates could be a newspaper—while driving. In addition, Chris was found holding a newspaper in his left hand after the accident. She contends that these two pieces of evidence should have led Ertons to conclude that Chris was a distracted driver whose vehicle crossed the median and caused the accident. However, the record does not compel that conclusion. In the grainy in-car photographs that are contained in the record, although an object resembling a newspaper is in the front passenger seat, the driver appears to be looking forward. In addition, although Chris was found holding a newspaper in his left hand after the impact, the in-car photograph clearly indicates that the driver's left hand was empty. We note, parenthetically, the medical examiner's testimony that Chris probably lived for "a few minutes" after the collision, during which time he could have picked up the newspaper that he was later found holding. Accordingly, the evidence does not necessarily force the conclusion that Chris was driving while distracted.

7. Thomas suggests that Ertons failed to investigate the possibility that Chris's vehicle transversed the median. To support this claim, Thomas points to the absence of photographs documenting the condition of the median north of the impact site, that is, the direction from which Chris's vehicle came. However, Ertons testified that he did examine the median for a distance of 100 feet north of the impact but did not find any fresh gouge marks. He did not think it necessary to document, as through photographs, the *absence* of any such scratch marks. As he explained, "There was no evidence to put in north of there[.] Unfortunately, [the photographing officer] did not take a picture farther north facing southbound; otherwise, that would just dull [appellant's] argument ... because I saw for myself there was no evidence north of that scene." Thus, we hold the evidence permitted Ertons to conclude that Chris did not cross the concrete median before the impact. For the same reason, we also reject Thomas's complaint that Ertons failed to examine the underside of Chris's vehicle for the presence of scratch marks that, she contends, might show that Chris's vehicle crossed over the median.

ward; in addition, Ertons suggested that the presence of witnesses would have been unlikely because the collision occurred in a rather remote, unpopulated location that he described as "the middle of nowhere."

Therefore, on the record presented, we hold that the trial court properly admitted Ertons's expert testimony as to the cause of the automobile collision. Next, we address Thomas's objection to Saenz's opinions about the vehicle speeds at the time of impact.

### 2. Vehicle Speeds

Thomas presents two basic objections to the reliability of Saenz's expert testimony. First, she contends that his opinions depend upon unreliable measurements provided by Ertons. Second, she argues that Saenz used flawed methodology to draw expert conclusions from those measurements. As such, she concludes the trial court should have excluded Saenz's opinions about the respective speeds of both vehicles at impact. *See Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 39 (Tex.2007).

#### a. Reliability of Underlying Data

■ We begin with a look at Ertons' measurements, which were transcribed from his notes into a scale diagram that Saenz used in calculating vehicular speeds. Thomas presents three objections to the reliability of these measurements. First, she claims that the device Ertons employed to take those measurements—a roller wheel—is less accurate than a "total station device." However, at the time of the accident, the Houston Police Department did not own a total station device, an instrument that Ertons described as only "very modestly more accurate" than a roller wheel. Moreover, Ertons testified that

a roller wheel produces reliable measurements, and further confirmed that the use of a roller wheel is generally accepted as a valid instrument used in taking measurements in the field of accident investigation. *See Robinson,* 923 S.W.2d at 557.

Second, Thomas contends that, because Ertons disposed of his original field notes, the measurements listed in the scale diagram cannot be trusted because the possibility exists that Ertons might have incorrectly transcribed the figures from his notes. In response, Ertons confirmed that he correctly copied all of the information from his field notes into the offense report, accident report, and scale diagram. In addition, had there been some question about the accuracy of his measurements, Ertons testified that the original figures could be recreated from the accident photographs through a process called "photogrammetry." Stated differently, the accuracy of the measurements could be tested and independently verified. Therefore, the loss of Ertons's field notes does not render those measurements unreliable. *See id.*

Third, Thomas challenges the use of the scale diagram altogether in rendering calculations about vehicle speed, because the initial pre-collision location of Chris's taxi on the diagram is entirely unsupported by any facts or measurements. She therefore insists that Saenz could not reliably use the figures listed in the diagram to calculate vehicle speeds. However, the record indicates that, in computing vehicle speeds, Saenz ignored Ertons's depiction of the pre-impact location of Chris's vehicle. This fact is borne out in the officers' testimony and the scale diagram itself.[8] Thus,

---

8. The scale diagram includes a notation that is the target of Thomas's objection. A vehicle position, assigned the notation "2," represents Chris's vehicle at some indeterminate point in time before the vehicles collided. Vehicle "2" appears well north of the impact scene, and is unencumbered by any specific measurements. The absence of any such

we cannot conclude that the trial court erred by permitting Saenz to draw conclusions from the measurements listed in the scale diagram.

*b. Reliability of Opinions Drawn from Data*

■ Saenz reached his opinions about vehicle speed by using a computer program called WinCrash. Thomas challenges those opinions on three basis grounds: (1) Saenz was forced to guess at the total pre-collision weight of each vehicle; (2) the speed calculations were generated using an incorrect impact-angle analysis; and (3) the WinCrash report contained several errors that undermine any confidence in the program's computations. As we address these concerns, we remain mindful that courts are not to decide whether an expert's conclusions are correct, but instead whether the analysis he used to reach them is reliable. *See Gammill,* 972 S.W.2d at 728. That guidance is particularly important here because the record is not well-developed enough to resolve some of appellant's challenges to the WinCrash report.[9] *See, e.g., Harris County Hosp. Dist. v. Textac Partners I,* 257 S.W.3d 303, 310 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (expressing reluctance to find error, and sustain appellate point, in light of underdeveloped appellate record). Generally, however, Saenz confirmed that his vehicle-speed calculations

rely upon well-known physics and mathematics principles, that the formulas he used are recognized and verifiable by other experts, and that the software and methodology he employed is reliable, peer-reviewed, and generally accepted by the accident-reconstruction community. *See Robinson,* 923 S.W.2d at 557.

■ Thomas's first complaint deals with the estimated pre-collision weights for each vehicle. Apparently, WinCrash requires the user to input the total weight of each vehicle before the impact. Unfortunately, those exact figures are almost always unavailable after a collision has occurred. Therefore, accident reconstruction experts must instead consider estimated vehicle weights. Here, for example, the average weight of Thomas's Nissan pickup truck is listed at 2,750 pounds; Chris's Ford Crown Victoria, by contrast, is said to weigh 3,920 pounds. Those base figures do not reflect the weight of vehicles laden with occupants, contents, or vehicle fluids such as gasoline. Therefore, Thomas acknowledges that "reconstructionists often have to guess the weights of vehicle[s] to compensate for debris and fluids that were lost during the crash[.]" However, the crux of her argument appears to arise from the fact that the accident-reconstruction community has not established definitive guidelines to be used in determining how many pounds should be added to a vehi-

measurements appears to be part of Thomas's complaint. That is, because vehicle "2" has no associated measurements, Thomas argues that its location on the diagram is the product of "mere conjecture." Thus, she insists that Saenz, in calculating vehicle speed, should not have used any of the measurements from the diagram.

However, the testimony indicates that Saenz did not rely on the hypothetically-placed vehicle "2" in rendering his speed calculations. Instead, the only scale-diagram data that he claimed to use were the measure-

ments themselves, and vehicle "2" has no such measurements. Ertons explained that, by placing vehicle "2" on the diagram, he simply meant to indicate that Chris was driving in the innermost of the two southbound lanes. Otherwise, vehicle "2" carries no significance on the diagram, and could have been omitted without changing anything meaningful about the scale diagram or the opinions generated from it.

9. The full WinCrash report was not included in the record.

cle's base weight to arrive at an estimated pre-collision weight.

Here, as in the usual case, Saenz could not have obtained an exact pre-collision weight for either vehicle because (1) both drivers were removed from the scene, one to the hospital and the other to the morgue; (2) debris was strewn all about the road; and (3) vehicle fluids had been splattered on the ground. Therefore, as an estimate of pre-collision vehicle weights, Saenz added 200 pounds to the Nissan's base weight to compensate for Thomas's weight and that of the contents and fluids. However, because a taxi typically carries extra equipment not ordinarily found in a passenger automobile, Saenz added more weight—300 pounds—to the Crown Victoria's base weight. Thomas does not specifically challenge these estimated figures, except to complain about the lack of an industry standard. We are left with no basis to question Saenz's validity given that both parties agree that the practice of using *estimated* pre-collision vehicle weights is generally accepted within the accident-reconstruction community. *See id.*

█ Apparently, another factor that WinCrash considers in calculating vehicle speeds is the angle at which the cars collide. Depending on the angle, WinCrash uses one of two different formulas to render its computations: a linear-momentum formula and an angular-momentum formula. When vehicles collide at an angle of greater than ten degrees, the angular-momentum formula should be used in lieu of the linear-momentum formula. Here, Saenz assumed that the vehicles collided at

an impact of twenty-one degrees. This determination would apparently dictate that WinCrash use the angular-momentum formula. Instead, Thomas contends that WinCrash incorrectly used the linear-momentum formula.

As we attempt to resolve this objection, we note that the record on this point is rather unclear. Even if we assume that WinCrash employed the incorrect formula in calculating vehicle speeds, the record is silent as to the effect of that error on the reliability of the program's conclusions. An entry in the HPD records implies that, if anything, WinCrash may have *under*estimated the speed of Thomas's vehicle at the point of impact. In any event, although WinCrash apparently reported a value using the linear-momentum value, Saenz's testimony suggests that the program *also* incorporated the correct angular-momentum formula.[10] Thus, we cannot conclude from this underdeveloped record that the trial court was required to exclude Saenz's expert testimony that Thomas was driving *at least* sixty-eight miles per hour.

█ Finally, Thomas contends that the WinCrash computations are unreliable because the program reported several error messages that should have undermined the trial court's confidence in the validity of its calculations. However, Saenz explained that each of the error messages was expected and could be explained by the physical evidence found at the accident scene. For example, WinCrash assumes that vehicles collide on a flat, level surface and that, after impact, there are no obstacles that might impede the vehicles' movement to their final resting spot. However, in this

---

10. Saenz's testimony on this point was as follows:

> Q. Does the WinCrash Data Program allow for an angular momentum formula?
> A. Yes.
> Q. And it wasn't used in this case?

> A. *It is used.*
> Q. Well, we see in this case that there was a linear momentum result, correct?
> A. I understand what you're saying. I'll agree with you.
> (Emphasis added.)

case, each vehicle met an obstacle that slowed or stopped its lateral movement after the accident. Because Thomas's truck was straddling the median, it did not fully rotate as would be expected on a flat surface because the median itself slowed that rotation. Similarly, the lateral movement of Chris's taxi was stopped by the presence of the guardrail on the side of the road. However, because WinCrash did not know about the existence of the median or guardrail, it predicted more rotation by Thomas's truck and greater lateral movement by Chris's taxi than actually occurred. Therefore, the program generated several error messages indicating that, if the collision occurred as indicated, the vehicles did not behave post-impact as the computer model predicted they would.

In response, Saenz testified that it is generally accepted in the accident-reconstruction community to rely upon WinCrash results when the program's error messages can be explained by the physical evidence. *See Robinson,* 923 S.W.2d at 557. Moreover, he indicated that, while the error messages might result in an understatement of the vehicles' lateral momentum speed, they would not affect the equivalent barrier speed, which was the calculation that Saenz quoted to the jury. Stated differently, the error messages had nothing to do with Saenz's equivalent-barrier-speed opinions.

Therefore, we conclude that the trial court properly admitted the expert testimony of both investigating officers, because their opinions were based on a reliable foundation. Accordingly, we overrule appellant's third issue.

**B. Legal and Factual Sufficiency of Evidence of Negligence, Proximate Cause, and Proportionate Responsibility**

▄▄▄ In her fourth issue, Thomas challenges the legal and factual sufficiency

of the evidence supporting the jury's findings that she was negligent and that her conduct was ninety-eight percent to blame for Chris's death. In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and must indulge every reasonable inference that supports the verdict. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We must credit evidence in support of the judgment if reasonable jurors could and must disregard contrary evidence unless reasonable jurors could not. *See id.* at 827. If the evidence falls within the zone of reasonable disagreement, we will not substitute our judgment for the fact finder's. *Id.* at 822. We must affirm unless there is no favorable evidence, the favorable evidence is rendered incompetent, or the contrary evidence conclusively establishes the opposite proposition. *See id.* at 810–11. Simply stated, we will consider whether the evidence at trial would have enabled reasonable and fair-minded people to reach the verdict that is under review. *Id.* at 827.

▄▄▄ By contrast, in a factual sufficiency review, we are to consider and weigh all of the evidence both supporting and contradicting the finding in question. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). We may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001). We may not pass upon the witnesses' credibility or substitute our judgment for the jury's even if the evidence could support a different result. *Transcon. Ins. Co.,* 274 S.W.3d at 98. The amount of evidence that is necessary to affirm a judgment is far less than the amount necessary to reverse it. *Id.; GTE Mobilnet of S. Tex. Ltd. P'ship v. Pas-*

*couet*, 61 S.W.3d 599, 616 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Thus, when we reverse a judgment for factual insufficiency, we must detail the evidence relevant to the issue and state in what manner the contrary evidence greatly outweighs the evidence in support of the judgment, but we need not do so when affirming a jury's verdict. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.1998); *Transcon. Ins. Co.*, 274 S.W.3d at 98 (citing *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex.2006)).

▆▆▆▆ Having determined that the expert opinions offered by Ertons and Saenz were based on a reliable foundation, we must consider those opinions in our sufficiency review. *See Transcon. Ins. Co.*, 274 S.W.3d at 99. Here, all of the following evidence supports the conclusion that Thomas, and not Chris, crossed the median and caused the accident that resulted in Chris's death:

- There were fresh gouge marks on the median, including powdery concrete residue, south of the impact scene— that is, the direction from which Thomas's truck came—but not north.
- All of the debris from the impact was on Chris's side of the road, indicating that the collision occurred on his side of the median. By contrast, there was no impact debris on Thomas's side of the median that would have indicated a collision in the northbound lanes; instead, the only debris that appeared on Thomas's side of the road was from materials that were flung out of the back of her pickup truck as it rotated after the collision.

- All of the vehicle fluids were spilled on Chris's side of the median, and there were no fluids splattered in the northbound lanes.
- Thomas's truck remained on top of the median even after the collision.
- Thomas was charged with, and pleaded guilty to, criminally negligent homicide arising from this accident. She also stipulated to the truth of the State's allegations that she "unlawfully ... cause[d] the death of Onyebu [Chris] Uzoka ... by criminal negligence, namely by failing to control speed, failing to maintain a single lane of traffic and exceeding the posted speed limit." [11]

This evidence supports the jury's findings that Thomas was negligent and that ninety-eight percent of the responsibility for causing Chris's death was attributable to her conduct. Therefore, we hold the evidence was legally sufficient to support the jury's verdict.

For the same reasons, we conclude that the jury's findings are not against the great weight and preponderance of the evidence. Although Thomas denied that she crossed the median, exceeded the speed limit, or caused the accident, the jury was not required to accept that testimony, particularly given the fact that she judicially admitted to having done all three. Moreover, as is discussed above, the evidence does not necessarily compel the conclusion that Chris caused the collision or that he was driving while reading a newspaper. Therefore, we hold that the evidence is factually sufficient to support the jury's verdict.

---

**11.** (Capitalization normalized.) Because Thomas pleaded guilty to the negligent acts charged against her, her plea was admissible as a judicial admission in the civil case arising from the same transaction. *See Johnston v. Am. Med. Int'l*, 36 S.W.3d 572, 578 (Tex. App.-Tyler 2000, pet. denied); *Lillie Sales, Inc. v. Rieger*, 437 S.W.2d 872, 874 (Tex.Civ. App.-Texarkana 1969, writ ref'd n.r.e.); *Barrios v. Davis*, 415 S.W.2d 714, 716 (Tex.Civ. App.-Houston 1967, no writ).

Accordingly, we overrule appellant's fourth issue.

## EXCESSIVENESS OF DAMAGE AWARDS

■ Lastly, we address appellant's first issue, in which she complains of the excessiveness of the jury's award of $810,000 to Ugochi for past and future pecuniary loss, loss of companionship and society, and mental anguish. We review an excessive-damages complaint for factual sufficiency of the evidence, using the guidelines identified above. *See Mar. Overseas Corp.*, 971 S.W.2d at 406.

■ We are reminded that the nebulous issues of pecuniary loss, mental anguish, and loss of society are inherently somewhat imprecise. *See Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 480 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); *Tri–State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 495 (Tex.App.-Houston [14th Dist.] 1989, no writ). Thus, because such damages are unliquidated and incapable of precise mathematical calculation, the jury is given significant discretion in fixing the amount of the award. *Weidner v. Sanchez*, 14 S.W.3d 353, 372 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 665–66 (Tex.App.-Fort Worth 1999, pet. denied); *see also Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 781 (Tex.App.-Corpus Christi 1999, pet. denied) ("[D]eterminations of pain and suffering damages cannot be neatly confined to mathematical certainties."). However, that discretion is limited in that it must enjoy evidentiary support; in other words, "[j]uries cannot simply pick a number and put it in the blank." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). With these considerations in mind, we turn to the evidence that bears upon the challenged elements of damages.

### A. Pecuniary Loss

■ In certain wrongful death actions, a beneficiary may recover damages for "pecuniary loss," that is, the present value of the benefits, including money and other benefits that could be valued in terms of money, that the beneficiary could reasonably expect to have received from the deceased had he survived. *Samco Props.*, 977 S.W.2d at 480. These lost financial benefits may be recovered even in the absence of specific evidence of the amount of contributions being made by the deceased before his death or that he would have continued to contribute in the future. *John Deere Co. v. May*, 773 S.W.2d 369, 381 (Tex.App.-Waco 1989, writ denied).

■ In arriving at its verdict awarding $10,000 in past damages and $100,000 for future pecuniary loss, the jury heard the following evidence as to the financial benefits Chris provided to Ugochi before his passing:

- Chris purchased an automobile for Ugochi, at a cost of between $4,000 and $4,500.
- Chris paid for some of Ugochi's meals and clothes.
- From time to time, Chris would send cash in $100 and $200 increments to Ugochi.
- Chris assisted with the payment of Ugochi's tuition at Texas A & M University, paying at least $1,000.[12]

Thus, the jury was presented with evidence indicating that, in the several years of their marriage, Chris provided financial contributions to Ugochi of more than $5,000. Further, Ugochi testified that,

---

**12.** The record is unclear as to whether this was a one-time gift of $1,000 or, alternatively, whether Chris made regular or periodic payments of $1,000 towards Ugochi's tuition.

upon graduation from Texas A & M University, she planned to return to Houston to live with Chris in a new apartment, where the couple intended to raise a family.[13] Thus, the jury was entitled to believe that, but for Chris's death, he would have continued to provide financial benefits to Ugochi. Therefore, we cannot conclude that the jury's finding of $10,000 in past pecuniary loss, representing the three-year time period between Chris's death and the trial, was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Francis, 46 S.W.3d at 242.

Similarly, the evidence indicates that, before his death, Chris was thirty-nine years old and in reasonably good health. The record contains no evidence suggesting that, but for his death, the couple could not have enjoyed several more decades of marriage during which Chris would continue to contribute financial benefits to Ugochi. Therefore, we hold that the evidence is factually sufficient to support the jury's award for pecuniary losses of $10,000 for past damages and $100,000 in the future.

### B. Mental Anguish and Loss of Companionship and Society

The jury also awarded the following damages for mental anguish and loss of companionship and society:

1. Mental anguish sustained in the past: $100,000;

2. Mental anguish that, in reasonable probability, would be sustained in the future: $50,000;

3. Loss of companionship and society sustained in the past: $100,000; and

4. Loss of companionship and society that, in reasonable probability,

would be sustained in the future: $450,000.

Appellant contends that all of these damage awards are excessive.

 At this juncture, we pause briefly to consider the distinctions between mental anguish and loss of companionship and society. While both compensate for non-economic losses, the two elements of damages are separate and do not overlap. See Moore v. Lillebo, 722 S.W.2d 683, 688 (Tex.1986). "Mental anguish" is defined as the emotional pain, torment, and suffering that the wrongful-death beneficiary experienced as a result of the death of her family member. Id. Damages for mental anguish are intended to compensate the beneficiary for the deleterious effect that the wrongful death had on the beneficiary. See id. To recover mental anguish, a claimant must demonstrate a high degree of mental suffering beyond disappointment, anger, resentment, or embarrassment, although mental anguish may include all of these emotions. See Phar–Mor, Inc. v. Chavira, 853 S.W.2d 710, 712 (Tex.App.-Houston [1st Dist.] 1993, writ denied). Thus, proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings. See Wal–Mart Stores, Inc. v. Odem, 929 S.W.2d 513, 528 (Tex.App.-San Antonio 1996, writ denied).

 By contrast, "loss of companionship and society" refers to the positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have experienced had the decedent lived. See Moore, 722 S.W.2d at 687–88. As compared with mental an-

---

13. Chris lived in Houston and was a student at Texas Southern University while working as a taxi driver. He lived with his wife on weekends, as they attended school in different locations during the week.

guish, which emphasizes the *negative* impact of the wrongful death on the beneficiary, loss of companionship and society focuses on the removal of *positive* benefits that the beneficiary once enjoyed but which were taken away by the wrongful death. *See id.* at 688. Although mental anguish is distinguishable from loss of companionship and society, in awarding damages for both elements, the jury may consider some of the same factors. Those considerations include (1) the relationship between the husband and wife; (2) the living arrangements of the parties; (3) any extended absence of the deceased from the beneficiary; (4) the harmony of family relations; and (5) the couple's common interests and activities. *See id.*

■ In this context, Thomas suggests that the couple's marriage was one that existed "in name only," and argues that Ugochi "suffered no adverse effects as a result of her husband's death." In so doing, Thomas emphasizes certain pieces of evidence, including that (1) the couple lived apart and maintained separate finances, (2) Ugochi was not listed as Chris's emergency contact, and (3) Ugochi had not met several of Chris's family members.

However, much of that evidence can be explained by the mere fact that, during the first few years of their marriage, circumstances forced the couple to live in different cities. Ugochi was enrolled at Texas A & M. At the time of her marriage, Ugochi had already relocated to College Station, where she maintained a separate apartment and bank account. Chris, a taxi driver and student at Texas Southern University, continued to work in Houston but saw and lived with Ugochi on the weekends. Further, it would not be unusual for Chris, who lived in an altogether different city from Ugochi, to have selected a geographically-closer friend as his emergency contact, in the event that something unfor-

tunate might occur to him while he was often located more than a hundred miles away from his wife.

The jury was presented with adequate evidence of the mental anguish and loss of companionship and society that Ugochi suffered because of her husband's death. The jury had the benefit of observing Ugochi as she testified at some length about the relationship she shared with Chris and the impact of his death on her. *See Seale v. Winn Exploration Co.,* 732 S.W.2d 667, 671 (Tex.App.-Corpus Christi 1987, writ denied). Among other things, she testified that they had made plans for the future. Ugochi intended to return to Houston after graduation and move into a "good apartment" with Chris. She had plans to follow through with a formal wedding ceremony inasmuch as they were initially married in an informal occasion at the courthouse. They also planned to have at least two, and possibly as many as four, children together.

Thus, given the record presented, we cannot conclude that the jury's award is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates the existence of bias. *See Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 622 (Tex.2004); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). Therefore, we hold that the evidence is factually sufficient to support the amount of damages awarded by the jury.

Accordingly, we overrule appellant's issue.

## CONCLUSION

Finding no merit in the issues presented on appeal, we affirm the judgment of the trial court.