Affirmed in Part; Reversed and Rendered in Part; and Opinion
filed March 30, 2010.



 



 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-07-00892-CV



 

Big Dog Logistics, Inc., Big
Dog Capital Corp., Big Dog Expediting, Inc., Big Dog Air freight, Big Dog
Logistics I, L.P., Big Dog Logistics, L.L.P., Frogfire Technologies, Inc., Big
Dog Group, Inc., Daniel Kirk, and Kirk Lane, 

Appellants and Cross-Appellees

V.

Strategic Impact Corporation,
Kim O. Brasch, and Maria C. Floudas,
Appellees and Cross-Appellants

 



On Appeal from the 280th
District Court

Harris County, Texas

Trial Court Cause No. 2004-56505



O P I N I O N

 

This case involves an appeal and a cross-appeal from
a final judgment rendered after a jury trial on several causes of action. 

In the first appeal, Big Dog Logistics, Inc., Big Dog
Capital Corp., Big Dog Expediting, Inc., Big Dog Air Freight, Big Dog Logistics
I, L.P., Big Dog Logistics, L.L.P., Frogfire Technologies, Inc., and Big Dog
Group, Inc. (collectively “Big Dog Logistics”) appeal (1) a judgment in favor
of Strategic Impact Corporation (“SIC”) on its breach-of-contract claim against
Big Dog Logistics and (2) a take-nothing judgment on Big Dog Logistics’s
breach-of-contract counterclaim against SIC.[1]

In the cross-appeal, SIC plus Kim O. Brasch and Maria
C. Floudas (husband and wife owners of SIC) appeal (1) a take-nothing judgment
on their fraud and conspiracy claims against Big Dog Logistics, Daniel Kirk (CEO
of Big Dog Logistics), and Kirk Lane (president of Big Dog  Logistics), and (2)
the trial court’s grant of judgment notwithstanding the verdict (“jnov”) on
theories for imposing personal liability on Kirk and Lane for the judgment
against Big Dog Logistics.

We
reverse and render with respect to the judgment in favor of SIC on its
breach-of-contract claim against Big Dog Logistics and affirm the remainder of
the judgment.    

I.  Background

A.        Factual
Background

Big Dog Logistics is a “third party logistics
carrier,” which provides services to its customers to facilitate transportation
of goods.  SIC is a consulting business, which, among other purposes, devises
strategies to assist its clients in expanding their business.

In late 2003, SIC approached Big Dog Logistics about
a potential relationship.  According to Big Dog Logistics, SIC proposed an
opportunity involving both parties’ buying scrap metal from another company and
selling it for profit.  Brasch testified he learned of Big Dog Logistics from
another source who reported Big Dog Logistics was facing a challenge and needed
a consultant.  Regardless, Big Dog Logistics and SIC generally agree that they
discussed the possibility of SIC’s providing its services to assist Big Dog
Logistics in obtaining business.

Big Dog Logistics and SIC executed three different
contracts.  The first two contracts were a non-disclosure agreement and a
consulting agreement, which was later superceded by another consulting
agreement pertinent to the present dispute.  

Specifically, on June 10, 2004, the parties signed a
“CONSULTING SERVICE AGREEMENT” (“CSA”).  In essence, the CSA provided that SIC
would use its established communication channels and experience to assist Big
Dog Logistics in pursuing “Prospect(s),” which was defined as “mutually agreed
upon business opportunities.”  Among other responsibilities, SIC agreed to
assist in identifying “key [p]roject participants,” introducing them to Big Dog
Logistics, and managing the business-development aspect of a project.

The CSA included a section regarding compensation for
SIC’s services.  Big Dog Logistics was required to pay SIC a monthly retainer
of $8,250 for a period of one year.  The agreement also provided,

 [Big Dog
Logistics] agrees to pay a mutually agreed upon bonus fee for transactions
generated through the closing of any transaction between [Big Dog Logistics]
and Prospect[s] as defined herein for the period of the agreement(s) between
the Prospect its agents, its assigns, or other persons or entities over which
the introduced Prospect has any control or influence and [Big Dog Logistics],
their agents, assigns, or any other person or entity over which [Big Dog
Logistics] has any control or influence.  This bonus is to be negotiated and
agreed upon in writing prior to the commencement of any initiative/project.   

In the CSA, the parties also agreed that, “[i]f
required,” they would form a new corporation for performance of SIC’s
services.  The parties separately agreed the new corporation would be called
“Big Dog Strategic Consulting Group, Inc.” and would receive revenues generated
through the relationship outlined in the CSA.

At the heart of this dispute was another document
entitled “BIG DOG STRATEGIC CONSULTING GROUP INITIATIVE LIST” (“the Initiative
List”), which consisted of three pages and was admitted as a separate exhibit
than the CSA.  The Initiative List admitted at trial had a hand-written
notation “June 10th 2004” above the title but was not signed or initialed by
either party.  Under the title were the names of two columns:  “Initiative and
(sub-initiatives)” and “%Upside split (SIC/BDL).”  The Initiative List then
contained a number of entries itemized according to various company names. 
Under most of these company names was a brief description of a type of service
or product followed by numbers shown as, for example, “50/50,” “70/30,”
“60/40.”  

The parties advance vastly different positions
regarding the import of the Initiative List as well as other events relative to
this suit.  

SIC claims the Initiative List outlined the parties’
agreement on projects to pursue and SIC’s bonuses.  Specifically, Brasch
testified that the parties negotiated the Initiative List during May and June
2004.  When Brasch, Floudas, Kirk, and Lane met on June 10, 2004 to execute the
CSA, they agreed on the Initiative List.  Kirk wrote “June 10, 2004” on the
Initiative List and attached it to the CSA.  Brasch offered an explanation for
the lack of any initials on the Initiative List:  the CSA was already printed
when the parties met on June 10, 2004; however, they were still developing the
Initiative List and, therefore, it was on a different computer;   once the
parties agreed on the Initiative List, they printed it and “didn’t think of
initialing.”  When Floudas was asked why the pages of the Initiative List were
not initialed, she replied, “It wasn’t required.  We didn’t think of it. We
didn’t get to it.”  Brasch also indicated that “%Upside split (SIC/BDL)”—the
numbers such as “30/70” corresponding with a particular project—meant
percentages that SIC and Big Dog Logistics respectively would each receive from
gross revenues generated by that project.  Brasch suggested the parties agreed
on a revenue split because it was simpler than analyzing costs for a project
before knowing what costs might be incurred and some projects involve minimal
costs.

In contrast, Big Dog Logistics contends the
Initiative List was merely a proposal by SIC, and Big Dog Logistics did not
agree to any bonus structure outlined therein.  According to the testimony of
Kirk and Lane, they did not know who wrote the June 10th date on the Initiative
List, they did not see the Initiative List before the CSA was signed, they did
not attach it to the CSA, and “the two documents don’t go together.”  Big Dog
Logistics also presented an e-mail Floudas sent to Kirk and Lane on June 11,
2004 (the day after the parties signed the CSA), stating in pertinent part,

Thanks for
lunch yesterday.  I am excited about being formally associated with you guys. 
I know that we will make tons of money.

As
promised, following is a list of our proposed initiatives with proposed project
upside splits between us.  Please review and ponder it over the weekend.  Dan,
we will see you on Monday at 10:00 and discuss it further.

. . .

The Initiative List was
attached to this e-mail, but there was no hand-written notation “June 10, 2004”
on this copy. 

Brasch and Floudas attempted to explain the use of
the term “proposed” in this e-mail: Big Dog Logistics requested a “soft copy”
of the Initiative List and, although the parties had already agreed on these
initiatives, they wanted to ponder whether there were any initiatives to add. 
At another point, Brasch simply admitted that Floudas may have used the “wrong
word” by referring to “proposed” initiatives.

Pertinent to this case was the following item on the
Initiative List:

Deutsche Post

1.         Logistics — 30/70 

Deutsche Post is a German company which manages the
German postal service and also operates other companies worldwide under the
banner of “DHL.”  In May 2004, Deutsche Post purchased a company named
“SmartMail” and changed its name to “DHL Global Mail.” SmartMail, now DHL
Global Mail, has been Big Dog Logistics’s client since 2001 and has accounted
for the majority of its revenues.[2] 
Deutsche Post also purchased DHL Express, with whom Big Dog Logistics also had
a relationship.[3]      

Brasch testified that the parties intended for the
“Deutsche Post” entry on the Initiative List to include DHL Global Mail because
Big Dog Logistics’s contract with DHL Global Mail was due to expire in August
2004 and Big Dog Logistics was concerned about losing the business in light of
Deutsche Post’s purchase of DHL Global Mail.  Brasch suggested Big Dog
Logistics understood that Brasch’s German nationality, contacts, and experience
would benefit Big Dog Logistics in attempting to retain DHL Global Mail as a
client, and Lane expressed Big Dog Logistics’s willingness to share its
revenues to achieve that purpose.  Therefore, Brasch indicated that the
above-cited “Deutsche Post” entry meant Big Dog Logistics agreed to pay SIC 30%
of its gross revenues from DHL Global Mail. 

According to the testimony of Kirk and Lane, they
never asked SIC to pursue any business with Big Dog Logistics’s existing
customers, particularly the DHL entities, and only enlisted SIC’s services to solicit
new business.  Moreover, they claimed that Big Dog Logistics never would have agreed to
pay anyone 30% of its gross revenues from DHL Global Mail because it did not
even net that amount after costs and overhead.

In any event, Brasch testified that he thereafter
made contact with the DHL entities with Big Dog Logistics’s approval and
participation. Through his various contacts, Brasch was granted an appointment
with Klaus Knappik, who was in charge of the integration phase relative to
Deutsche Post’s purchase of DHL Global Mail.  Knappik was unable to attend the
scheduled meeting because of a conflict, so he referred Brasch to Dr. Gerhard
Gompf, the new head of DHL Global Mail responsible for making recommendations
regarding business components of the company that could potentially be
eliminated.  

Brasch spoke with Dr. Gompf by telephone. Brasch
testified that he introduced Big Dog Strategic Consulting Group, Inc., made the
presentation he had planned for Knappik, and was well received by Dr. Gompf. 
In contrast, Dr. Gompf testified that Brasch said he wanted to help DHL Global
Mail eliminate its “dependency” on Big Dog Logistics.  When asked whether
Brasch made any statements to promote Big Dog Logistics’s services, Dr. Gomph
replied, “No.  Just the opposite.”  When further asked whether Brasch or SIC
played any role in Big Dog Logistics’s retention of DHL Global Mail’s business,
Dr. Gomph responded, “Again, exactly the opposite.  I had the impression the
call was made to help us get away from Big Dog Logistics.” 

Brasch further testified that, through his contacts,
he was also referred to Chet Paul, a regional sales director of DHL Express. 
Brasch and Paul negotiated a contract between DHL Express and “Big Dog
Strategic Consulting Group,” which was signed in late August 2004.  Brasch
claimed that this contract was part of his strategy to retain the DHL Global
Mail business for Big Dog Logistics.  Brasch planned to use this contract in
his presentation to Deutsche Post as an example of a strategic alliance that
could be formed between Big Dog Strategic Consulting Group, Inc. and Deutsche
Post entities to make profits, so Deutsche Post would not view Big Dog
Logistics as a cost center to be eliminated.  Brasch further testified that, after
this contract was signed, he initiated scheduling a meeting so that he, Kirk,
and Lane could meet Paul.  

Again, Big Dog Logistics presented contrasting
testimony, claiming it first learned of this contract shortly after it was
signed.  According to Kirk, he was the person involved in arranging a meeting
with DHL Express representatives, and they informed him DHL Express was already
involved in discussions with the CEO of Big Dog Logistics, which Kirk knew was
incorrect.

On September 7, 2004, Chet Paul and two other DHL
representatives, Marc Casaccia and Jeffrey Corte, arrived at Big Dog
Logistics’s office for the scheduled meeting, which resulted in execution of a
contract between Big Dog Logistics and DHL Express.  According to Corte, Brasch
“barged” into the meeting and yelled expletives at Kirk.  However, Brasch
provided the following version of this incident:  Kirk was hostile and excluded
him from the meeting, stating “You’re out of that deal”; Brasch responded that
“this is an introduced party as defined in the agreement”; he told all
participants the agreement between Big Dog Logistics and SIC was violated “if
I’m cut out”; and he left without causing “a scene” and called Lane to inquire
about Kirk’s actions.  

The next day, Lane met with Brasch and Floudas.  Lane
testified that he explained the relationship “wasn’t going well,” “sales had
been zero,” and Big Dog Logistics never asked SIC to become involved with its
“current customers” or “agent base.”  Lane then suggested that the parties
complete the arrangement regarding the scrap-metal purchase, which he
considered the only possible remaining basis for a relationship.  Brasch and
Floudas then threatened to destroy Lane’s business and reputation.  Big Dog
Logistics then paid the monthly retainer due on October 1, 2004 but quit paying
the retainers once it was sued by SIC. 

According to Brasch, Lane stated that Big Dog
Logistics would continue to perform the CSA only if SIC refrained from
performing work on the Deutsche Post initiative.  Brasch replied that SIC was
owed bonuses because of its work on the Deutsche Post initiative.  Lane
subsequently expressed that Big Dog Logistics would continue to perform the CSA
and pay the bonuses.  However, after stalling on paying the bonuses, Big Dog
Logistics ultimately refused to honor the CSA.  

B.        Procedural
History

SIC, Brasch, and Floudas sued Big Dog Logistics,
Kirk, and Lane for various causes of action, including breach of contract,
fraud, and conspiracy.  SIC also requested that the corporate veil of the “Big
Dog” entities named in the suit be pierced because Kirk and Lane used the
corporate fiction to perpetuate fraud and alleged the “Big Dog” entities
operated as a single business enterprise.  Big Dog Logistics filed a
counterclaim for breach of contract, among other claims. 

Relative to this appeal, the jury found as follows:
Big Dog Logistics agreed to pay SIC 30% of all revenues from DHL Global Mail on
or after September 1, 2004; Big Dog Logistics’s failure to pay was not excused;
SIC sustained damages of $1,298,902.90 resulting from Big Dog Logistics’s
failure to pay, which the parties seem to agree was approximately 30% of gross
revenues from DHL Global Mail during a certain time period; certain amounts
were reasonable fees for services of SIC’s attorneys; Big Dog Logistics, Kirk,
and Lane did not commit fraud against SIC, Brasch, and Floudas; several of the
“Big Dog” entities, Kirk, and Lane operated as a single business enterprise;
Kirk and Lane were each responsible for the conduct of Big Dog Logistics; and
SIC did not fail to comply with the CSA.  The jury did not answer the submitted
question regarding conspiracy because an answer to this question was
conditioned on an affirmative finding regarding fraud.

The trial court originally rendered judgment against
Big Dog Logistics, Kirk, and Lane consistent with the jury’s verdict.  These
parties subsequently filed a motion and supplemental motion for jnov relative
to certain findings and a motion for new trial.   The trial court granted jnov
with respect to the findings that Kirk and Lane individually were part of a
single business enterprise and were each responsible for the conduct of Big Dog
Logistics.  Our record does not include a written order on these parties’
motion for new trial.  Therefore, we treat the motion as overruled by operation
of law except for portions rendered moot by grant of the jnov.  SIC, Brasch,
and Floudas also filed a motion for partial new trial, which the trial court
denied by written order.

Accordingly, on November 2, 2007, the trial court
signed an “Amended Final Judgment” (1) reciting that it had granted jnov on the
theories for imposing personal liability on Kirk and Lane for the judgment
against Big Dog Logistics, (2) awarding SIC $1,298,902.90 in actual damages, pre
and post-judgment interest, costs of court, and attorney’s fees for trial and
appeal, against the Big Dog Logistics entities only, and (3) ordering that Big
Dog Logistics take nothing on its breach-of-contract counterclaim.  The trial
court did not expressly order that SIC, Brasch, and Floudas take nothing on
their fraud and conspiracy claims; however, the judgment implicitly encompassed
such order by expressing that all relief not granted was denied and that it was
a final judgment disposing of all causes of action in the suit.  

II.  Big Dog Logistic’s Appeal

Big Dog Logistics appeals (1) the judgment in favor
of SIC on its breach-of-contract claim and (2) the take-nothing judgment on Big
Dog Logistics’s breach-of-contract counterclaim against SIC.

 A.       SIC’s
Breach-of-Contract Claim Against Big Dog Logistics 

In its first four issues, Big Dog Logistics
challenges the award of damages to SIC on its breach-of-contract claim against
Big Dog Logistics.  

            1.         Issues
and Standard of Review

In its first three issues, Big Dog Logistics
challenges the jury’s affirmative answer to Question 1 of the charge which
asked,

Did Big Dog
Logistics make an agreement with [SIC] that Big Dog Logistics will pay 30% of
all revenues from DHL Global Mail to [SIC] on or after September 1, 2004?

Big Dog Logistics contends the evidence is legally
and factually insufficient to support this finding because (1) there was no
such agreement in writing as required by the CSA, (2) the Initiative List
lacked the essential terms necessary to constitute a contract, and (3) a
reasonable juror could not have found that Big Dog Logistics entered into such
an agreement.  At trial, Big Dog Logistics objected to submission of Question
1, asserting, among other grounds, there was no evidence of any such
agreement.  Big Dog Logistics also moved for a new trial on this ground.

As both parties seem to acknowledge, there was no
agreement to pay any particular bonuses in the CSA.  Rather, the CSA required
that bonuses be “agreed upon in writing” before commencement of a
project. (emphasis added).  The Initiative List was the only document that
arguably could be characterized as such a writing; therefore, the parties focus
their arguments on this document.

Although Big Dog Logistics presents three separate
stated issues, it advances several interrelated substantive reasons the
Initiative List was not a written agreement regarding projects and bonuses,
much less an agreement to pay SIC 30% of gross revenues from DHL Global Mail:
(1) Floudas’s e-mail, sent the day after the parties signed the CSA,
referred to the Initiative List as “our proposed initiatives with proposed
project upside splits” (emphasis added); (2) the Initiative List lacked any
signatures or initials to show the parties’ assent thereto; (3) the Initiative
List lacked the essential term of a “price” because the cryptic notation “30/70,”
even if it referred to percentages, did not indicate whether it meant
percentages of gross profits, gross revenues, or some other amount, and
Brasch’s parol testimony could not establish the meaning of “30/70,” see
Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., 48
S.W.3d 865, 877 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (recognizing
that, relative to contract required by law to be in writing, parol evidence may
not supply essential elements but may be used to explain or clarify essential
terms appearing in the instrument); (4) the testimony of Brasch and Floudas
regarding the alleged agreement was conclusory and contradicted the documentary
evidence;[4]
(5) DHL Global Mail was not a “Prospect” within the purview of the CSA because
it was an existing client, not a “mutually agreed upon business opportunit[y],”
and SIC played no role in introducing DHL Global Mail to Big Dog Logistics; and
(6) a finding that Big Dog Logistics agreed to a contract that caused it to
lose money was irrational.[5]

In contrast, SIC characterizes the dispute on
existence of an agreement as merely a factual issue on which we must defer to
the jury’s findings.  SIC contends parol evidence was permissible merely to
explain that the pertinent entry on the Initiative List meant Big Dog Logistics
would pay SIC 30% of gross revenues from DHL Global Mail.  SIC further argues
that the jury was free to believe the testimony of Brasch and Floudas reflecting
the parties orally agreed on June 10, 2004 to this bonus structure and attached
the Initiative List to the CSA.

Big Dog Logistics’s fourth issue is apparently an
alternative argument.  Big Dog Logistics contends Question 1 was improperly
worded because the jury was allowed to find existence of an agreement regarding
bonuses based solely on a purported oral agreement.  Big Dog Logistics contends
the trial court erred by refusing to submit Big Dog Logistics’s alternative
question, which would have more accurately apprised the jury a written
agreement was required.

We agree that the trial court erred by submitting any
jury question regarding formation of an agreement requiring Big Dog Logistics
to pay SIC 30% of revenues from DHL Global Mail because there was no evidence
of a written agreement as required by the CSA.  Therefore, we will discuss only
Big Dog Logistics’s no-evidence contention.

When examining a legal-sufficiency challenge, we
review the evidence in the light most favorable to the challenged finding and
indulge every reasonable inference that would support it.  City of Keller v.
Wilson, 168 S.W.3d 802, 822 (Tex. 2005).  We credit favorable evidence if
reasonable jurors could and disregard contrary evidence unless reasonable
jurors could not.  Id. at 827.  There is “no evidence” or legally-insufficient
evidence when (a) there is a complete absence of evidence of a vital fact, (b)
the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact, (c) the evidence offered to prove
a vital fact is no more than a mere scintilla, or (d) the evidence conclusively
establishes the opposite of the vital fact.  See id. at 810;  Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  The evidence
is legally sufficient if it would enable reasonable and fair-minded people to
reach the verdict under review.  City of Keller, 168 S.W.3d at 827.

2.         Analysis

We will assume, without deciding, the evidence was
sufficient to show that the parties orally agreed on June 10, 2004 that Big Dog
Logistics would pay SIC 30% of Big Dog Logistics’s gross revenues from DHL
Global Mail and attached the Initiative List to the CSA.  Nevertheless, the
evidence was legally insufficient to establish existence of an agreement
enforceable under the CSA because there was no writing showing the
parties’ assent to this bonus structure.

Evidence of mutual assent in written contracts
generally consists of signatures of the parties and delivery with the intent to
bind.  Baylor University v. Sonnichsen, 221 S.W.3d 632, 635 (Tex.
2007).  The Initiative List was not signed or initialed by either party, and it
contained no language of assent; i.e., it included no statement that the
parties agreed to any bonus structure listed therein.  Although the testimony
of Brasch and Floudas arguably showed the Initiative List was not merely a
proposal, there was nothing on the list itself to show it was an agreement as
opposed to a proposal.  Quite simply, the Initiative List was just that—a
“list” of various items—with nothing to demonstrate it constituted some type of
agreement with respect to these items.  In short, the Initiative List may have
contained essential terms, but it did not include an agreement. 

To purportedly overcome this deficiency, SIC suggests
Brasch’s testimony that the Initiative List was attached to the CSA on the day
it was signed demonstrated it was “part” of the agreement.  However, simply
proving the Initiative List was attached to the CSA did not establish that the
parties agreed in writing to the bonuses outlined on the Initiative
List.  Apparently, SIC claims the signatures on the CSA were sufficient to
establish that any attached document represented an agreement of the parties. 
However, there was no reference to the Initiative List in the CSA and certainly
no language indicating the parties agreed to the bonus structure outlined
therein.  In fact, the reference to bonuses in the CSA implied that the parties
contemplated a future written agreement.      We find that cases addressing
whether a writing was sufficient to satisfy the statute of frauds are
persuasive although Big Dog Logistics does not argue the agreement was required
to satisfy the statute of frauds.  To satisfy the statute of frauds, “there
must be a written memorandum which is complete within itself in every material
detail, and which contains all of the essential elements of the agreement, so
that the contract can be ascertained from the writings without resorting to
oral testimony.”  Cohen v. McCutchin, 565 S.W.2d 230, 232 (Tex. 1978); BACM
2001-1 San Felipe Rd. Ltd. P’ship v. Trafalgar Holdings I, Ltd., 218 S.W.3d
137, 144 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

Several court have recognized that, under this rule,
language showing the parties’ assent to a particular agreement must be included
within the written memorandum.  For example, many years ago, in Osborne v.
Moore, 112 Tex. 361, 361–65, 247 S.W. 498, 498–500 (Tex. 1923), the court
addressed whether a writing purportedly memorializing a sale of real property
was sufficient to satisfy the statute of frauds.  The writing offered by the
plaintiff was a check made payable to the defendant for a certain amount which
contained a memorandum stating “[t]o bind deal on [property description]” and
the phrase “[a]ccepted. [defendant’s agent].”  247 S.W. at 498.  The court held
that the memorandum lacked an express promise to sell or convey the property
because the notation “to bind deal” did not necessarily imply such an
agreement; this phrase could refer to an agreement to sell or convey property,
but it could also refer to an entirely different transaction, such as an
agreement to lease the property.  Id. at 499.  The defendant’s agent
testified he accepted the check in order to sell the property to the
plaintiff.  Id. at 498–99.  However, the court held, “[p]arol evidence
is not admissible to prove such an important element of the contract as the
real kind or character of the transaction actually agreed upon by the
parties.”  Id. at 499.

In Birenbaum v. Option Care, Inc., 971 S.W.2d
497, 501 (Tex. App.—Dallas 1997, pet. denied), the prospective seller of
securities sued the prospective buyer for breach of contract after the buyer refused
to consummate the transaction.  The court of appeals held that a document sent
by fax from the buyer to the seller was not a sufficient writing to satisfy the
statute of frauds.  Id. at 501–02.  The document contained a stated
quantity and price but was not signed.  Id. at 501.  Although the buyer
signed a “post it” note transmitting the fax, the court concluded this
signature did not “authenticate the document to which it was attached as
the agreement of the parties.”  Id. at 502.  The court rejected the
seller’s contention that the statute of frauds did not require language
exhibiting a “present intention to be bound” and that there was no need “for
the writing to contain verbs of commitment.”  Id.  The court stated that
the writing required to be signed for purposes of the statute of frauds is not
just a “piece of paper” but a writing sufficient to indicate a contract has
been made.  Id.  Although a “thumbprint would authenticate the writing
as coming from its author,” the writing still fails to satisfy the statute of
frauds if it is not “sufficient to indicate that a contract has been made.”  Id.

Likewise, if we review the CSA and the Initiative
List together, these writings did not show that the parties agreed Big Dog
Logistics would pay the bonuses purportedly referenced on the Initiative
List.   The fact that the Initiative List was attached to the CSA which was
signed by the parties demonstrated at most that Big Dog Logistics acknowledged
the list as some sort of writing pertinent to the parties’ relationship.  Based
solely on the writings, we cannot foreclose the possibility that the Initiative
List was merely a proposal or an example of the form required for a future
agreement on bonuses, as opposed to a definitive agreement that Big Dog Logistics
would pay the outlined percentages.  Therefore, Brasch’s or Floudas’s testimony
was still necessary to prove existence of the agreement.  The fact that we
cannot discern any such agreement without resorting to their testimony
establishes there was no agreement in writing.  This case is not a situation in
which a party offered parol evidence to merely explain essential terms that
were included within a written contract but were unclear.  Rather, SIC relied
on parol evidence to provide the assent necessary to establish an agreement in
the first place. 

Finally, SIC relies heavily on a pleading filed by
Big Dog Logistics in a separate lawsuit.  In 2006, Big Dog Logistics sued SIC,
Brasch, and Floudas in federal court for trademark infringement and unfair competition
related to their use of a “Big Dog Logistics” name and logo.  Big Dog Logistics
pleaded that the parties “executed a [CSA] on June 10, 2004, a copy of which is
attached as Exhibit A . . . .”  Exhibit A included both the CSA and the
Initiative List as one document.  In the present case, SIC argued to the trial
court that the federal pleading was a “judicial admission” these documents were
“the operative contract.”  The record does not reflect that the trial court
admitted the federal complaint as a judicial admission.  On appeal, SIC argues
that, even if the federal complaint was not a judicial admission, it was some
evidence that Big Dog Logistics viewed the Initiative List as the parties’
agreement regarding bonuses.  

Kirk and Lane essentially disavowed any role in
attaching the two documents as one exhibit to the federal complaint, indicating
instead that Big Dog Logistics’s attorney in the federal suit (not the same
attorney involved in the original contractual transaction) must have obtained
both documents from Big Dog Logistics’s files and attached them as one
exhibit.  Accordingly, Big Dog Logistics argues that a mistake by an attorney
who was involved in the original transaction could not constitute a judicial
admission that the parties agreed to the bonus structure purportedly outlined
on the Initiative List.

Even if an assertion in the federal complaint could
be construed as a judicial admission, the allegation therein showed at most
that the Initiative List was attached to the CSA when executed by the parties. 
In the federal complaint, Big Dog Logistics did not assert that the Initiative
List reflected an agreement regarding initiatives to be pursued and bonuses. 
We have explained that mere attachment of the Initiative List to the CSA was not
sufficient to show a written agreement for payment of the bonuses purportedly
outlined therein.  Therefore, the fact the CSA and Initiative List were treated
as one exhibit to the federal complaint was not evidence that the parties
agreed in writing to the bonuses outlined in the Initiative List, as
required by the CSA. 

In sum, because the CSA required a written agreement
regarding payment of bonuses and the only writing offered was insufficient to
establish such an agreement, there was no evidence to support the finding that
Big Dog Logistics agreed to pay SIC 30% percent of revenues from DHL Global
Mail.  Accordingly, we sustain Big Dog Logistics’s first issue, which renders
moot its second, third, and fourth issues.

B.        Big Dog
Logistics’s  Breach-of-Contract Counterclaim Against SIC 

In its fifth issue, Big Dog Logistics contends the
evidence is factually insufficient to support the jury’s finding, in response
to Question 15 of the charge, that SIC did not breach the CSA.  Big Dog
Logistics presented this contention in its motion for new trial.

            1.         Standard
of Review

In a factual-sufficiency review, we consider and
weigh all the evidence, both supporting and contradicting the finding.  Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406–07 (Tex. 1998); Thomas v.
Uzoka, 290 S.W.3d 437, 452 (Tex. App.—Houston [14th Dist.]  2009, pet.
denied).  When, as here, a party attacks factual sufficiency with respect to an
adverse finding on which it had the burden of proof, it must demonstrate on
appeal that the finding is against the great weight and preponderance of the
evidence.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).  We
will set aside the finding only if it so contrary to the overwhelming weight of
the evidence as to be clearly wrong and unjust.  Id.  The trier of fact
is the sole judge of the credibility of witnesses and the weight to be given to
their testimony.  GTE Mobilnet of S. Tex. v. Pascouet, 61 S.W.3d 599,
615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).  Because we are not a
fact finder, we may not pass upon the witnesses’ credibility or substitute our
judgment for that of the jury, even if the evidence would support a different
result.  Mar. Overseas Corp., 971 S.W.2d at 407; Thomas, 290
S.W.3d at 452–53.  The amount of evidence necessary to affirm a judgment is far
less than the amount necessary to reverse it.  Thomas, 290 S.W.3d at
452–53; Pascouet, 61 S.W.3d at 616.  Thus, if we reverse a judgment for
factually insufficiency, we must detail the evidence relevant to the issue and
state how the contrary evidence greatly outweighs the evidence in support of
the verdict; we need not do so when affirming a jury’s verdict.  Mar.
Overseas Corp., 971 S.W.2d at 407; Thomas, 290 S.W.3d at 453.

            2.         Analysis

Big Dog Logistics contends the jury’s finding is
contrary to the great weight and preponderance of the evidence because SIC
breached the CSA in several interrelated respects.  

Big Dog Logistics claims that SIC failed to pursue
“mutually agreed upon business opportunities,” as required by the CSA, and
instead pursued its own opportunities at Big Dog Logistics’s expense.  In
support, Big Dog Logistics cites the testimony of  Kirk and Lane, insisting
they did not authorize SIC to approach Big Dog Logistics’s existing clients. 
According to Big Dog Logistics, SIC not only approached the DHL entities but
also attempted to discourage DHL Global Mail from doing business with Big Dog
Logistics and now wants a share of Big Dog Logistics’s revenues from this
client.

Big Dog Logistics also contends SIC violated its
agreement under the CSA “to hold in confidence any and all Confidential
Information on [Big Dog Logistics] disclosed to [SIC] by [Big Dog Logistics].” 
The definition of “Confidential Information” included “all project and business
information, Prospect and all its business information, business strategies and
tactics, business contacts . . . customer lists . . . .”  According to Big Dog
Logistics, SIC misused this confidential information by relying on it to
approach Big Dog Logistics’s existing clients without authorization.  

In addition, Big Dog Logistics contends that SIC’s
pursuit of its own agenda with Big Dog Logistics’s existing clients resulted in
its obtaining no new business for Big Dog Logistics, despite Big Dog
Logistics’s paying SIC substantial monthly retainers. 

At trial, Lane expressed his anger with the situation
by explaining that Big Dog Logistics brought SIC into its organization to make
money together, created Big Dog Strategic Consulting Group, Inc. to keep SIC
away from Big Dog Logistics’s core business, and gave SIC office space and
other resources from which to pursue business; instead, SIC did not pursue any
opportunities, the situation was a total “scam job,” and SIC tried to steal the
business for which Lane “worked my whole life.”

As we have discussed, the jury heard conflicting
testimony on whether the DHL entities were “mutually agreed upon business
opportunities” under the CSA.  The jury, as sole judge of the credibility of
witnesses, was free to believe Brasch’s testimony that Big Dog Logistics
requested SIC to approach these entities and his testimony describing efforts
he made to assist Big Dog Logistics in retaining the DHL Global Mail business. 
See Pascouet, 61 S.W.3d at 615–16.

Big Dog Logistics advances several reasons it was
unreasonable for the jury to believe Brasch’s version of events.  Big Dog
Logistics suggests Brasch provided conflicting testimony on whether he
contacted Chet Paul, or vice-versa, and Paul testified he merely responded to a
message to call Brasch.  However, when read in context, Brasch actually
testified that he ultimately made contact with Paul by contacting Paul’s superiors,
who instructed Paul to contact Brasch.  Therefore, the testimony was not
necessarily inconsistent because the pivotal contact was initiated by Brasch
although Paul made the telephone call in which they first spoke. 

Big Dog Logistics also cites Brasch’s misrepresenting
himself to Paul as an employee of Big Dog Logistics as a “prime example” of
SIC’s pursuit of its own opportunities.  In the testimony cited by Big Dog
Logistics, Paul did assert that he thought Brasch was a “Big Dog employee” and would
not have spoken with Brasch if he had known differently.  However, Paul also
clarified there were multiple “Big Dog” entities.  Because the parties agreed
to jointly form Big Dog Strategic Consulting Group, Inc., Brasch’s representing
himself as an employee of a “Big Dog” entity did not establish he was working
against Big Dog Logistics’s interests.  

We acknowledge that the testimony of Dr. Gompf
indicating Brasch discouraged him from doing business with Big Dog Logistics
seems persuasive because Dr. Gompf is a third party with no stake in the
present litigation.  Nevertheless, the jury was free to decide the weight to
assign this factor when evaluating whether Brasch presented Big Dog Logistics
favorably to Dr. Gompf.  

Finally, we recognize SIC does not cite any evidence
that its efforts actually produced revenues for Big Dog Logistics. 
Specifically, SIC does not seek any bonuses based on any revenues generated
through the relationship between Big Dog Logistics or Big Dog Strategic
Consulting Group, Inc. and DHL Express.[6] 
Further, even if Brasch presented Big Dog Logistics favorably to Dr. Gomph, SIC
does not cite any evidence demonstrating DHL Global Mail’s decision to retain
Big Dog Logistics resulted from this conversation.  Nevertheless, the CSA required
only the pursuit of business and did not guarantee that SIC’s services would
result in revenues.  Under SIC’s version, it, at least, pursued “mutually
agreed upon business opportunities.” We cannot conclude that the evidence
supporting SIC’s version is so contrary to the overwhelming weight of the
evidence as to render the jury’s verdict clearly wrong and unjust.

Accordingly, we conclude the evidence is factually
sufficient to support the jury’s finding that SIC did not breach the CSA.  We
overrule Big Dog Logistics’s fifth issue.[7]

III.  Cross-Appeal of SIC, Brasch, and Floudas 

In the cross-appeal, SIC, Brasch, and Floudas
(hereafter, “cross-appellants”)  challenge (1) the jury’s finding that Big Dog
Logistics, Kirk, and Lane (hereafter, “cross-appellees”) did not commit fraud and
thus the lack of any finding on conspiracy and (2) the trial court’s grant of
jnov on the theories for imposing personal liability on Kirk and Lane for the
judgment against Big Dog Logistics.[8]

A.        Fraud and Conspiracy

We will first consider cross-appellants’ fourth
issue, contending the evidence is factually insufficient to support the jury’s
finding, in response to Question 4 of the charge, that cross-appellees did not
commit fraud.  Cross-appellants raised this contention in their motion for new
trial.  Additionally, the jury was instructed to answer Question 7 only if it
answered Question 4 affirmatively.  Question 7 inquired whether Kirk and Lane
were each part of a conspiracy that damaged cross-appellants.  Therefore, cross-appellants
contend the judgment should also be reversed for the jury to answer the
conspiracy question if we determine the evidence is factually insufficient to
support the finding of no fraud.  We have already set forth the applicable
standard of review when a party attacks factual sufficiency of the evidence to
support a jury finding on which it had the burden of proof.

The jury was given definitions for three alternate
methods of committing fraud: material misrepresentation, failure to disclose a
material fact, and fraud in the inducement relative to contract formation.  On
appeal, cross-appellants do not specifically state which method was applicable
to this case.  However, the evidence they cite to challenge the jury’s finding
seemed to fit within the first or second methods; they do not contend SIC was
fraudulently induced to contract with Big Dog Logistics, although they made
such an argument to the jury.  

The jury
was instructed as follows relative to the first and second definitions:

Fraud
occurs when— 

a.         a
party makes a material misrepresentation.

b.         the misrepresentation is made with knowledge of its falsity
or made recklessly without any knowledge of the truth and as a positive
assertion.

c.         the misrepresentation is made with the intention that it
should be acted on by the other party, and

d.         the other party acts in reliance on the misrepresentation
and thereby suffers injury.

Fraud also
occurs when— 

a.         a party fails to disclose a material fact within the
knowledge of that party,

b.         the party knows that the other party in ignorant of the fact
and does not have an equal opportunity to discover the truth.

c.         the party intends to induce the other party to take some
action by failing to disclose the fact, and

d.         the other party suffers injury as a result of acting without
knowledge of the undisclosed facts.

. . .

“Misrepresentation”
means:

a.         a false statement of fact;

b.         a promise of future performance made with an intent not to
perform as promised;

c.         a statement of opinion based on a false statement of fact;

d.         a statement of opinion that the maker knows to be false; or

e.         an expression of opinion that is false, made by one claiming
or implying to have special knowledge of the subject matter of the opinion. . .
.    

Cross-appellants’ challenge to the jury’s finding
focuses solely on cross-appellees’ alleged actions and statements relative to
formation of the new corporation, Big Dog Strategic Consulting Group, Inc. 
According to Brasch’s testimony, the parties agreed that Kirk, Lane, Brasch,
and Floudas would be directors of the corporation and Brasch and Floudas would
own fifty percent of the shares.  Big Dog Logistics attorney, William
Underwood, offered his legal services to incorporate the new entity.  Brasch
asked if he and Floudas needed their own attorney, but Underwood replied that
was “not necessary” because forming a corporation was a routine matter. 
Underwood formed the corporation with only himself, Kirk, and Lane as
directors.  In July 2004, these three directors held shareholder and director
meetings in Cancun without notifying Brasch and Floudas.  When Brasch asked
Underwood about the exclusion of Brasch and Floudas as directors, Underwood
replied that there had been a mistake and he would correct the problem through
the Secretary of State.  Underwood, Kirk, and Lane then represented to Brasch
and Floudas that the changes had been made.  Brasch subsequently learned
through his own research that the Secretary of State had rejected the changes
because of a failure to follow proper procedures.  As of trial, its records
still showed only Underwood, Kirk, and Lane as directors.  Further, Brasch
suggested that Kirk and Lane did not account for some stock certificates of the
new corporation and issued less total shares than agreed on, so they could
potentially issue more shares and make themselves majority shareholders, thus
diluting the shares already issued to Brasch and Floudas. 

Cross-appellants contend that cross-appellees,
through these actions, prevented Brasch and Floudas from being directors and
equal shareholders so cross-appellees could “take all the revenue for
themselves”; when Brasch’s persistence thwarted their efforts, cross-appellees
diverted revenues received from DHL Global Mail, which Brasch helped generate,
around Big Dog Strategic Consulting Group, Inc. and directly to themselves. 

However, cross-appellees presented evidence directly
contradicting Brasch’s testimony.  According to Kirk and Lane, all parties
agreed Underwood would form the corporation.  When Lane and Kirk asked if
Brasch and Floudas had an attorney, they responded that “Floudas is better than
any attorney.”  Additionally, Brasch and Floudas were uncertain they wanted to
be directors because of liability concerns.  Thus, their presence was not required
at the meeting in Cancun because they were not directors, but they were
informed about the meeting.  The evidence is undisputed that Underwood later
attempted to amend the articles of incorporation to add Brasch and Floudas, but
the amendment was rejected by the Secretary of State because of procedural
defects.  However, Kirk explained that he subsequently refused to pay the fee
necessary to correct the defect because he learned SIC had attempted to solicit
Big Dog Logistics’s clients.

Again, we are presented with conflicting testimony on
whether any misrepresentations or failures to disclose were made concerning the
incorporation of Big Dog Strategic Consulting Group, Inc., and the jury was
free to believe cross-appellees’ testimony.  We cannot conclude the evidence
supporting cross-appellees’ version is so contrary to the overwhelming weight
of the evidence as to render the jury’s verdict clearly wrong and unjust.

With respect to the manner in which cross-appellees
issued shares in the new corporation, cross-appellants cite no evidence that
any dilution of Brasch’s and Floudas’s shares actually occurred.  Consequently,
cross-appellants cite no evidence showing that any allegedly false promise to
make Brasch and Floudas 50% shareholders caused any injury.  

In sum, the evidence is factually sufficient to
support the jury’s finding that cross-appellees did not commit fraud. 
Accordingly, we overrule cross-appellants’ fourth issue.

B.        Theories
Regarding Personal Liability of Kirk and Lane 

In their first issue, cross-appellants contend the
trial court erred by granting jnov with respect to the jury’s finding, in
response to Question 10 of the charge, that several of the “Big Dog” entities,
Kirk, and Lane operated as a single business enterprise, to the extent it
imposed liability on Kirk and Lane individually.  In their second and third
issues, cross-appellants contend the trial court erred by granting a jnov with
respect to the jury’s affirmative answers to Questions 11 and 12 of the charge,
asking whether Kirk and Lane respectively were “responsible for the conduct of
Big Dog Logistics.”       

After cross-appellants filed their brief, the Texas
Supreme Court rejected single business enterprise as a basis for piercing the
corporate veil and imposing one corporation’s liabilities on another.  See
SSP Partners v. Gladstrong Invs. (USA) Corp., 275 S.W.3d 444, 450–56
(Tex. 2008).  Nevertheless, even our court, when previously espousing the
single-business-enterprise theory, adopted it as a basis for imposing one corporation’s
liabilities on another and not as a separate ground of recovery.  See
Paramount Petroleum Corp. v. Taylor Rental Ctr., 712 S.W.2d 534, 536 (Tex.
App.—Houston [14th Dist.] 1986, writ ref’d n.r.e.), abrogated by SSP
Partners, 275 S.W.3d 444.  Moreover, Questions 11 and 12 were submitted
solely as a basis for imposing liabilities of Big Dog Logistics on Kirk and
Lane and not as separate causes of action.  Indeed, alter ego theories, when
applicable, are used to impose corporate liabilities on shareholders.  See
SSP Partners, 275 S.W.3d at 451–52.

As explained, SIC cannot prevail on its
breach-of-contract claim against Big Dog Logistics—the only claim on which the
trial court awarded damages to SIC—and we have upheld the take-nothing judgment
on cross-appellants’ fraud claim against Big Dog Logistics.  Therefore, the
challenge to the jnov on the findings relative to single business enterprise
and personal responsibility of Kirk and Lane is rendered moot by our
dispositions relative to the breach-of-contract and fraud claims.  Accordingly,
we overrule cross-appellants’ first, second, and third issues.

IV.  Conclusion

We reverse the portion of the trial court’s judgment
awarding Strategic Impact Corporation $1,298,902.90 in actual damages, trial
and appellate attorney’s fees, costs of court, and pre and post-judgment
interest against Big Dog Logistics, Inc., Big Dog Capital Corp., Big Dog
Expediting, Inc., Big Dog Air Freight, Big Dog Logistics I, L.P., Big Dog
Logistics, L.L.P., Frogfire Technologies, Inc., and Big Dog Group, Inc. and
render judgment that Strategic Impact Corporation take nothing on its
breach-of-contract claim.  We affirm the remainder of the judgment.

 

                                                                                                                                                                                                                                    

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

Panel consists of Chief Justice Hedges and Justices
Seymore and Price.[9]









[1]
The judgment was rendered with respect to all above-listed appellants
collectively although the parties to the contract at issue were “Big Dog
Logistics, Fire Frog Technologies and their parent and/or subsidiary companies”
and not all appellants were submitted in the jury charge.  Because all these appellants
are similarly situated relative to our analysis, we will refer to them
collectively as “Big Dog Logistics.”  Further, one such party, Big Dog Group,
Inc., was not named in appellees’ petition although they sued an entity called
“Big Dog Strategic Consulting Group, Inc.,” which is also referenced in the
parties’ appellate briefs.  Because Big Dog Group, Inc., not Big Dog Strategic
Consulting Group, Inc., was the party against whom judgment was rendered and it
filed a notice of appeal, we will treat it as an appellant.





[2]
In the briefs and record, this company is referred to by several variations
including both “DHL Global Mail” and “Global Mail.”  For consistency,
throughout this opinion, we will use “DHL Global Mail” to refer to both that
company and its predecessor, “SmartMail.”  





[3]
We have also noticed more than one variation for the entity referred to as “DHL
Express,” but we will use this name.   





[4]
With respect to their testimony, Big Dog Logistics further claims that Brasch
purportedly acknowledged the Initiative List was merely a proposal by stating
there would be another “decision point” regarding bonuses after the parties
reached an agreement with a third-party prospect.  However, in the cited
excerpt, it is not clear Brasch was referring to deferral of an agreement on
bonuses until the parties reached an agreement with a prospect.  Read in
context, Brasch may have been explaining that, even after the parties agreed to
an initiative split, they were not bound to accept an agreement with a
prospect.





[5]
Big Dog Logistics also emphasizes SIC’s petition contained allegations that
were opposite to its position at trial and on appeal and essentially negated
the parties agreed to any bonus structure purportedly outlined on the
Initiative List when they executed the CSA.  Specifically, SIC alleged that,
“[o]n June 11, 2004 [the day after the parties signed the CSA], SIC
prepared and forwarded a list of Prospects and Initiatives that included
Deutsche Post . . . .,” and “[a]t the same time, SIC and [Big Dog Logistics] began
negotiations regarding the compensation percentage fee for these SIC
Prospect [sic] if [Big Dog Logistics] were able to contract with one of these
SIC Prospects.”  (emphasis added).  SIC then alleged that the parties agreed to
form “Big Dog Strategic Consulting Group, Inc.,” through which SIC would be
paid its percentage bonuses of “50% of gross profits of all brokered deals and
45% of all managed logistics projects.”  Additionally, the gravamen of the
breach-of-contract claim as pleaded was that Big Dog Logistics committed a
breach, or anticipatory breach, by prematurely terminating the CSA and thus
depriving SIC of future payments due thereunder.  However, later in the
petition, SIC requested breach-of-contract damages of 50% of Big Dog
Logistics’s gross profits.  Regardless, SIC did not plead that Big Dog
Logistics agreed to pay SIC 30% of gross revenues from DHL Global Mail. 
However, Big Dog Logistics does not cite any portion of the record showing it
requested the trial court to treat these allegations in SIC’s petition as
judicial admissions or objected to submission of Jury Question 1 because there
was no supporting pleading.  Consequently, we will not consider these
allegations in our legal-sufficiency analysis.





[6]
Because SIC does not seek to recover
bonuses based on any revenues from DHL Express, this entitity is significant
only to Big Dog Logistics’s counterclaim that SIC breached the CSA by
approaching DHL Express. 





[7]
We note our disposition of this issue is not inconsistent with our conclusion
on Big Dog Logistics’s first issue.  Although the jury was free to believe
SIC’s evidence showing it did not breach the CSA by approaching the DHL
entities, SIC’s right to receive bonuses for its services required a written
agreement and there was no such agreement as a matter of law.  





[8]
Because there are multiple parties on both sides of these issues, we will refer
to SIC, Brasch, and Floudas collectively as “cross-appellants” and Big Dog
Logistics, Kirk, and Lane collectively as “cross-appellees,” except where
necessary to refer to a party separately. 





[9]
Senior Justice Frank C. Price sitting by assignment.