

# Fourth Court of Appeals
### San Antonio, Texas

## OPINION

No. 04-15-00463-CV

**JBS CARRIERS, INC.** and James Lundry,
Appellants

v.

Trinette L. **WASHINGTON**, Sophia Renee Lenzy, Thomas Charles Lenzy, Individually and as
Representatives of the Estate of Mary L. Turner, Deceased,
Appellees

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2013-CI-13011
Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:    Karen Angelini, Justice
Dissenting Opinion by:  Marialyn Barnard, Justice

Sitting:        Karen Angelini, Justice
               Marialyn Barnard, Justice
               Rebeca C. Martinez, Justice

Delivered and Filed:  January 11, 2017

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

This appeal arises out of a personal-injury negligence suit brought by the surviving children of Mary L. Turner, who was killed in an accident when she was struck by an 18-wheeler tractor-trailer driven by James Lundry, an employee of JBS Carriers, Inc. ("JBS"). At trial, the jury determined that Lundry's negligent conduct was 50% responsible for the accident; JBS's negligent conduct was 30% responsible for the accident; and Mary Turner's negligent conduct was 20% responsible for the accident.

On appeal, JBS argues that the evidence is legally and factually insufficient to support the jury's finding of direct negligence on its part. JBS and Lundry argue that the trial court's evidentiary rulings resulted in an improper judgment. Finally, JBS and Lundry argue that the evidence is legally and factually insufficient to support the jury's award of wrongful-death damages to two of Turner's children: Sophia Lenzy and Thomas Lenzy. We hold the evidence is legally and factually sufficient to support the jury's finding of direct negligence against JBS. We also conclude that the trial court did not abuse its discretion in its evidentiary rulings. Finally, we hold the evidence is legally and factually sufficient to support the jury's award of wrongful-death damages to Sophia Lenzy and Thomas Lenzy.

In addition to the appeal brought by JBS and Lundry, Turner's surviving children, Trinette L. Washington, Sophia Lenzy, and Thomas Lenzy (collectively "the Turner Family"), have brought a cross-appeal, arguing that the trial court's judgment erroneously omitted the jury's award of survival damages to Mary Turner. The Turner Family also argues the trial court's judgment contained mathematical errors. They argue that the amount of wrongful-death damages awarded to Turner's surviving children and the amount of prejudgment interest are not calculated correctly in the judgment. We affirm the trial court's rendering of judgment in favor of the Turner Family. However, because we agree the trial court's judgment erroneously omitted the jury's award of survival damages, erroneously calculated the wrongful-death damages, and erroneously calculated prejudgment interest, we reverse the judgment of the trial court in part and remand the cause to the trial court with instructions to sign an amended judgment in conformity with this opinion.

### BACKGROUND

On August 27, 2012, at 6:43 p.m., Mary Turner was walking along a sidewalk on Rittiman Road in San Antonio. She then walked into the parking lot of a convenience store, cutting the corner at the intersection of Rittiman and Goldfield. She walked slowly. As she got close to the

intersection, James Lundry, a truck driver with JBS, who was traveling in the same direction as Turner on Rittiman Road, approached the intersection in his 18-wheeler tractor trailer and began to make a right-hand turn from Rittiman to Goldfield. As Lundry began making the turn, a car on Goldfield approached the intersection and stopped at the red light, resulting in less room for the turning radius on the 18-wheeler. Lundry thus could not complete the right turn on Goldfield and stopped his 18-wheeler. Neither the 18-wheeler nor the car could move without either Lundry or the driver of the car backing up. As both the 18-wheeler and the car remained stopped, Turner continued her walk and started crossing the street in front of the 18-wheeler. Meanwhile, according to Lundry's testimony at trial, the driver of the car was "cussing at" Lundry and was making "hand signals" at him. Lundry testified he made his own "hand gesture" toward the other driver, which Lundry claimed was to let the other driver know that he needed to back up his car. According to Lundry, he made the gesture between three and five times. Turner continued walking across the street. The other driver then backed up his car. As Turner approached the space between the 18-wheeler and the car, three things happened simultaneously: the car moved to the right to go around the truck, Turner continued walking, and Lundry in the 18-wheeler continued driving and ran over Turner. The right-front fender of the 18-wheeler hit Turner, causing her to be thrown underneath the tires of the 18-wheeler.

According to Lundry, as the car went around the left side of the 18-wheeler, Lundry accelerated and was watching the car in his left mirror, trying to see if the car had scratched the 18-wheeler as it drove past. Lundry testified that he did not know he had hit Turner and did not stop the 18-wheeler. Witnesses later found him and told him that he had hit a pedestrian.

A security camera mounted on a convenience store at the intersection captured the accident. When Turner began to cross Goldfield and first stepped into the street, she was about twenty-five feet away from Lundry's 18-wheeler. JBS's expert, Scott Altman, testified that Lundry would have

been able to see Turner at this point if he had been looking in her direction. JBS's safety director at the time of the accident, Randall Kopecky, testified that if Lundry had seen Turner walking across the street, he should have yielded to her.

The Turner Family sued JBS and Lundry for wrongful death. In addition to suing in their individual capacities, they also brought a survival action as Turner's representatives and sought damages for Turner's mental anguish, and pain and suffering that she suffered before her death. They alleged that Lundry, who was acting in the scope and course of his employment with JBS, was negligent. They also alleged that JBS was negligent in failing to properly train Lundry in safely operating the 18-wheeler tractor-trailer.

A jury found that Lundry, Turner, and JBS were all negligent. The jury attributed 50% of the responsibility to Lundry, 30% of the responsibility to JBS, and 20% of the responsibility to Turner. The jury found that $500,000 would fairly and reasonably compensate Turner for pain and mental anguish. It also found funeral and burial expenses to be in the amount of $7,895.00. With respect to the three children, the jury was asked to determine the amount of money that would fairly and reasonably compensate the children for (1) loss of companionship and society sustained in the past; (2) loss of companionship and society that, in reasonable probability, will be sustained in the future; (3) mental anguish sustained in the past; and (4) mental anguish that, in reasonable probability, will be sustained in the future. The jury awarded all three children $75,000.00 in each category. Thus, the jury found that each of Turner's children sustained a total of $300,000.00 in damages.

JBS and Lundry filed a notice of appeal. The Turner Family then filed a notice of cross-appeal.

**LEGAL AND FACTUAL SUFFICIENCY OF EVIDENCE TO SUPPORT NEGLIGENCE FINDING AGAINST JBS CARRIERS**

JBS first argues that there is legally and factually insufficient evidence to support a negligence finding against it. JBS concedes that Lundry was acting within the course and scope of his employment and thus JBS is responsible for Lundry's negligence under the doctrine of respondeat superior. However, JBS argues there is no evidence or factually insufficient evidence to support the jury's finding that JBS, itself, was 30% responsible for causing or contributing to the accident. JBS contends that the Turner Family presented no evidence that it was negligent in its hiring of Lundry or in any way negligent in failing to train or supervise him. JBS also argues there is no evidence that it was negligent in entrusting a truck to Lundry or that it was negligent in failing to maintain the truck involved in a roadworthy manner.

When reviewing a jury finding for legal sufficiency, we "must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Reeder v. Wood Cty. Energy, LLC*, 395 S.W.3d 789, 795 (Tex. 2012). "A legal sufficiency challenge will be sustained when, inter alia, the evidence offered to prove a vital fact is no more than a mere scintilla." *Id.*

When reviewing a jury finding for factual sufficiency, we set aside "the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding," we determine that "the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered." *Crosstex N. Tex. Pipeline, LP v. Gardiner*, No. 15-0049, 2016 WL 3483165, at *24 (Tex. June 24, 2016).

According to JBS, the evidence at trial showed that it had a rigorous hiring, training, supervision, and maintenance program to ensure motorist and driver safety. JBS points to

testimony from Scott Hall, Lundry's supervisor at JBS. Hall testified that every driver at JBS has a CDL license and that JBS prescreens the drivers for driving history and criminal backgrounds before they are hired. The drivers then attend an orientation where safety procedures are taught. Hall testified the orientation process is a combination of classroom PowerPoints, videos, on-the-job, and a road test. According to Hall, Lundry went through this orientation process in February 2012. Lundry testified that when he was hired by JBS, he had three days of orientation training and then took an oral or written test. Lundry also testified that he passed a road test, and every quarter of the year, passed a safety quiz.

In support of its argument, JBS also emphasizes that the Turner Family's expert, Cam Cope, was questioned whether he "thought there were any bad hiring or training in this particular case by JBS of the driver, Mr. Lundry" and that Cope replied, in his opinion, there was not. The Turner Family points out that Cope's testimony should not be given great weight on this specific issue as Cope was qualified as an expert in "accident reconstruction" and was not an expert in the trucking industry's safety and training protocols.

In support of the jury's finding of negligence on behalf of JBS, the Turner Family also points to testimony that JBS did not give Lundry any training regarding the blind spot in front of the 18-wheeler. Scott Hall testified that all vehicles have different blind spots. Hall did not know if JBS had ever trained drivers specifically on the right-front-fender blind spot. Hall was asked about JBS's 2014 training manual that showed three specific blind spots, but did not mention a blind spot in the front of the 18-wheeler. Hall agreed the manual showed three blind spots but did not show one in the front of the 18-wheeler where Turner had been hit.[1] The Turner Family also

---

[1] JBS criticizes this evidence, arguing that it only talks about 2014, which was after the accident. But, in reading Hall's testimony, it is clear that Hall was consistent in his testimony that before 2014 JBS trained drivers in the blind spots depicted in the manual. Hall was also consistent that he has no recollection of JBS ever training drivers about the right-front blind spot.

points to Lundry's testimony that while JBS gave him specific training on blind spots, he could not recall receiving any training from JBS about the blind spot in the right front of the 18-wheeler.

The Turner Family emphasizes that JBS admits there was an eighteen-foot blind spot in front of the 18-wheeler and that the blind spot was a contributing factor in the accident. Hall testified that blind spots on an 18-wheeler are in different locations depending on the size of the truck and the size of the driver. The Turner Family points out that Lundry testified he is a shorter gentleman and had to keep his seat low to reach the pedals on the floorboard; thus, his blind spot was larger than a taller driver. In addition to Lundry's shorter stature increasing the size of the blind spot, JBS had also installed a CB radio on the dash that further blocked Lundry's view. JBS's expert, Scott Altman, testified that the CB radio mounted on the dash increased the size of the blind spot. Hall, Lundry's supervisor, admitted that although JBS had conducted ergonomic testing for its drivers to see if the drivers could properly operate the equipment, Hall could not say if any testing was done to see if a driver, due to his body type, could see over the CB radio.

The Turner Family contends that testing done by JBS's expert showed that because of the blind spot, Lundry's seat position, and the CB radio, Lundry could not have seen Turner when she was standing eighteen feet in front of his truck. In support of this statement, the Turner Family points to Altman's testimony that Turner was about twenty-five feet away from the truck when she stepped into the road. Altman testified that at this point Lundry would have been able to see Turner's face. Altman testified that Turner was 5'1", so the right front blind spot was about eighteen feet, which Altman characterized as being "significant."

The Turner Family argues that if Lundry had been trained about the eighteen-foot blind spot in front of the 18-wheeler, "he would have known that he could not assume that just because he did not see anything in front of him" did not mean there was not anyone in front of him. The Turner Family argues that based upon this evidence, "the jury was free to conclude that JBS failed

to use ordinary care when it instructed Lundry on how to safely operate the 18-wheeler he was driving at the time of the accident and when it failed to determine whether Lundry's seat position allowed him to see in front of the truck." We agree with the Turner Family. Reviewing the evidence discussed above, we hold that the jury's finding of direct negligence against JBS was supported by legally and factually sufficient evidence.

### EVIDENTIARY RULINGS

On appeal, JBS and Lundry complain the trial court erred in (1) excluding evidence of Turner's pre-existing mental health disease and her drug and alcohol use at the time of the accident; and (2) in admitting the opinions of Cam Cope and in allowing the jury to view an animation prepared by Cope.

"Evidentiary rulings are committed to the trial court's sound discretion." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). "A trial court abuses this discretion when it acts without regard for guiding rules or principles." *Id.* "Even if the trial court abused its discretion in admitting certain evidence, reversal is only appropriate if the error was harmful, *i.e.*, it probably resulted in an improper judgment." *Id.*

JBS and Lundry first argue that the trial court erred in excluding Turner's daughter's admission to Detective Doyle that Turner had paranoid schizophrenia and bi-polar disorder. Right before Detective Doyle was called to testify, the parties discussed whether the entirety of Detective Doyle's police report, which included references to Turner's mental health disease, should be admitted or referred to during Detective Doyle's testimony. The trial court sustained the Turner Family's objection under Texas Rule of Evidence 403 and ruled that Detective Doyle could not testify about Turner's daughter's statement to police. The trial court further ordered the police report be redacted to omit any reference to Turner's mental health disease. The redacted police report, Defendants' Exhibit 145-A, was admitted in evidence. During this discussion, JBS's

counsel referred to the motion in limine hearing where the trial court had made a preliminary ruling to exclude any reference to Turner's drug use and mental health. JBS's counsel requested that the trial court make a final ruling as to whether he could cross-examine witnesses about Turner's drug use and mental health issues. JBS's counsel further explained that he wanted to offer some medical records at the time he called JBS's expert medical witness, Dr. Miller, to the stand and thus would be discussing Turner's drug use and mental health problems. The trial court ruled, "I mean, there is some relevance, but I still think the prejudice outweighs, you know, what you want to put in so at this point I'm still going to sustain the objection by [the Turner Family] as to not going into those areas." Thus, the trial court excluded the evidence under Texas Rule of Evidence 403.

Pursuant to Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TEX. R. EVID. 403. When a party objects under Rule 403, a trial court must conduct a balancing test, weighing the danger of prejudice against the probative value of the evidence. *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 424 (Tex. App.—Eastland 2006, no pet.). "'Unfair prejudice' means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (citing *Weidner v. Sanchez*, 14 S.W.3d 353, 365 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).

JBS cites *Bedford v. Moore*, 166 S.W.3d 454 (Tex. App.—Fort Worth 2005, no pet.), for the proposition that "[e]vidence of drug or alcohol use is admissible where there is further evidence of negligence and improper conduct on the part of the user." JBS argues that the security camera footage, itself, is evidence of negligence and improper conduct on the part of Turner because the video shows her "failing to yield the right-of-way to Lundry, entering the road far removed from the intersection, and failing to stop at a time and place to avoid the accident." JBS also points to Detective Doyle's testimony that Turner failed to yield the right-of-way and was at fault for

causing the accident. Characterizing this evidence as negligent and improper conduct by Turner, JBS argues *Bedford* applies. However, even assuming the evidence of drug usage is relevant in this case, *Bedford* merely addresses the admissibility of such evidence under Texas Rule of Evidence 401. It does not address Rule 403 and thus does not address the trial court's ruling in this case.

JBS also cites *Nichols v. Howard Trucking Co.*, 839 S.W.2d 155, 155-56 (Tex. App.—Beaumont 1992, no writ), which involved a head-on collision between two vehicles. The central issue in the case was which vehicle had crossed the center lane and caused the collision. *Id.* at 156. The trial court admitted in evidence, without objection, a defendant's exhibit showing that Nichols, one of the drivers, had not slept for a twenty-four-hour period before the accident. *Id.* at 157. There was also evidence that Nichols had consumed alcoholic beverages in the evening hours before the accident. *Id.* Dr. Griffin, the doctor who performed the autopsy on Nichols, testified that Nichols had 51.6 milligrams percent of alcohol in his system at the time of the autopsy, which is equivalent to 0.0516 percent alcohol concentration. *Id.* The defendant also offered into evidence a urinalysis test performed by Dr. Griffin as part of the autopsy. *Id.* The urinalysis was positive for marijuana. *Id.* The plaintiff objected pursuant to Rule 403. Unlike in the instant case, the trial court in *Nichols* overruled the plaintiff's objection and admitted the urinalysis evidence. *Id.*

On appeal, the plaintiff argued the trial court abused its discretion in overruling his objection. The court of appeals reasoned that "the evidence clearly shows acts of negligence and improper conduct on the part of Mr. Nichols." *Id.* at 158. The court concluded that the urinalysis results provided "some explanation for the negligence and improper conduct." *Id.* The court held that the trial court did not abuse its discretion in overruling the objection:

> Appellant tells us that the trial court abused its discretion in allowing the evidence regarding the urinalysis to be presented to the jury contending that the probative value of such evidence is outweighed by the danger of unfair prejudice. We agree

that the admission of the urinalysis was prejudicial to plaintiff's case; however, we do not believe that same constituted an unfair prejudice. Relevant evidence is almost always prejudicial to the party against whom same is offered. In order to find error through abuse of discretion, we must determine that the admission of such prejudicial evidence was calculated to cause and probably did cause the rendition of an improper judgment. Normally, reversible error does not occur in connection with evidentiary rulings on questions of evidence unless the whole case turns on the particular evidence admitted or excluded. *Atlantic Mutual Insurance Co. v. Middleman*, 661 S.W.2d 182 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.). Recalling the evidence, Corporal Fikes testified that Nichols crossed the center line causing the collision. Charles Davis testified that Mr. Nichols crossed the center line causing the collision. The jury was free to resolve the disputed issues based upon this evidence alone. The jury was also free to resolve the issues against plaintiff based upon the testimony of defendants' expert witness, Nalle. Other evidence showed blood alcohol content and further that Mr. Nichols had not slept in nearly 24 hours. Plaintiff cannot demonstrate that the entire case turned on the admission of the positive drug screen result. Appellant has shown no abuse of discretion by the trial court in admitting the questioned evidence.

*Nichols*, 839 S.W.2d at 158.

In the instant case, the trial court sustained the Rule 403 objection. Thus, JBS and Lundry must show an abuse of discretion by the trial court. Further, for any error to be reversible, JBS and Lundry must show that "the entire case turned on the admission" of Turner's mental health issues and drug abuse. *See id.*

JBS and Lundry argue that they met this standard through their bill of exception, which contains Dr. Miller's proffered testimony. Dr. Miller testified that he practices family medicine and is the family physician of one of JBS's attorneys. Dr. Miller testified about the medical condition of paranoid schizophrenia. Dr. Miller testified he reviewed some medical records of Turner's visit with a Dr. Edwards and some records from Methodist Specialty Hospital. Dr. Miller also reviewed the autopsy and toxicology report on Turner, along with video of the accident.

Dr. Miller testified that two and a half months before the accident, at a visit with Dr. Edwards, Turner's medical records show that she was taking nine different medications, including Vicodin and Xanax. Dr. Miller testified Vicodin and Xanax can impact one's cognitive ability.

According to Dr. Miller, Dr. Edwards's records state that Turner had had chronic anxiety. Further, Dr. Miller testified that in June 2012, Dr. Edwards wrote in his records of Turner's need to be seen in a psychiatric facility. Dr. Miller testified that Dr. Edwards's records reflect that in August 2012, about two and a half weeks before the accident, Turner received a psychiatric evaluation at Methodist. Dr. Miller testified that the medical records from Methodist state Turner's diagnosis was schizophrenia paranoid type and bipolar disorder and that Turner was prescribed two more medications in addition to the six that she had been prescribed by Dr. Edwards. According to Dr. Miller, schizophrenia paranoid and bipolar disorder are permanent conditions that can be improved with treatment but not cured. Dr. Miller testified that Turner's medical records reflect that Turner's mental condition worsened fifteen days before the accident, and she was prescribed Clonazepam and Lithium. Dr. Miller testified that Clonazepam and Lithium can have sedative effects. When asked if Turner was taking other medications prescribed by Dr. Edwards, Dr. Miller testified that he did not know because Dr. Edwards's last visit with Turner was two and a half months before the accident.

Dr. Miller also testified that the medical records further showed Turner had a history of abusing crack cocaine. According to Dr. Miller, the toxicology report showed that Turner was positive for an opiate, consistent with Vicodin, one of the medications prescribed by Dr. Edwards. Dr. Miller testified the toxicology report did not show Xanax or Klonopin, both of which were prescribed by Dr. Edwards during his last visit with Turner. Dr. Miller concluded that Turner was not taking those medications even though Dr. Edwards had prescribed them to treat the anxiety component of her paranoid schizophrenia and bipolar conditions. Dr. Miller testified that the effect of Turner not taking those medications was that "[h]er condition would get much worse."

Dr. Miller testified that patients like Turner who have paranoid schizophrenia, "particularly those with exacerbation," lose cognitive abilities. They "will feel or sense that they're being

spoken to or being talked to by inanimate objects, hearing voices from the furniture, from the walls, from the television telling them to do certain things and they're not able to ascertain what is real and what's not." "They lose grasp on reality. They're unable to separate out what is real and what's not." Dr. Miller testified that Turner "was a rather unfortunate individual because of her extensive medical problems, her paranoid schizophrenia, her bipolar disorder and having been prescribed at least eight medications within two and a half time – two and a half months of time of her death, this poor unfortunate lady was pretty much damned if she did and damned if she didn't." "With the medications themselves in combination could have a significant impact on her mental state or not taking those medications and her disease getting worse would probably have even a worse impact."

The Turner Family points out that Dr. Miller was not Turner's physician, did not treat her, and had never even met or talked with Turner. Dr. Miller was the family doctor of one of JBS's attorneys. Further, the Turner Family emphasizes that Dr. Miller's opinions at the time of trial were much different than at the time of his deposition. During his deposition, Dr. Miller testified that he had no knowledge of Turner's specific state of mind at the time of the accident:

> All I can say is that in general, someone with schizophrenia and/or bipolar disorder can – that condition can contribute to their cognitive abilities and their grasp on reality and the way that they properly deal with conditions around them. Beyond that, *I cannot say anything as to the specific state of mind that Mary Turner had on the day she died or any other day or was that disease in better control or worse control or was she functioning normally that day or not.* So, that's all I can say [interruption by counsel] is that in general, that schizophrenia and/or bipolar disorder can contribute to someone's cognitive abilities and [her] grasp on reality.

(emphasis added). In his deposition, Dr. Miller admitted that persons suffering from bipolar disorder experience different symptoms, manic and depressive states, and that he did not know which symptoms Turner may have been suffering from on any day, much less the day of the accident. Dr. Miller testified in his deposition that someone with mental health issues like Turner

could be impaired by those conditions but that he had no opinion as to whether or not Turner was impaired at the time of the accident.

Dr. Miller also admitted in his deposition that he knew no details of Turner's schizophrenia; the records from Methodist Specialty and Transplant Hospital did not identify what signs or symptoms Turner was experiencing. According to Dr. Miller, "Dr. Edwards's records mentioned several times anxiety" but Dr. Miller "did not specifically say that it was anxiety related to her schizophrenia." Dr. Miller admitted that the only symptom experienced by Turner he could link to schizophrenia was "anxiety."

With regard to the autopsy and toxicology report, Dr. Miller was questioned during cross-examination at trial whether he could give an opinion as to any levels of drugs and/or alcohol that would have impaired Turner. Dr. Miller replied, "At the time of her death, no." Dr. Miller testified that Turner had opiates in her system, that she was not taking two of her prescribed medications that would improve her condition, and that she had cocaine in her system. According to Dr. Miller, any of those *could possibly* impair an individual but he could not testify to a reasonable, medical probability that they impaired Turner on the day in question.

We find no abuse of discretion by the trial court in excluding Dr. Miller's testimony pursuant to Rule 403. Dr. Miller, a family physician, based his opinions on medical records made over two months before the accident. His trial testimony linking Turner's medical records to her specific state of mind on the day of the accident was weak, and in his deposition, he admitted he could not testify about Turner's state of mind on the day of the accident. Further, the security camera footage of the accident does not show Turner acting erratically. Therefore, we cannot say that the trial court abused its discretion in determining, pursuant to Rule 403, that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice in labeling Turner a bipolar schizophrenic drug addict.

JBS and Lundry also argue that "Cope's testimony regarding what was visible to Lundry and the animation purporting to depict that testimony is unreliable, factually incorrect, and represents no more than the subjective belief and unsupported speculation of Cope." JBS and Lundry argue the animation was not created with accurate measurement or scientific method and thus misled the jury as to the actual line-of-sight from Lundry's perspective. According to JBS, the "animation prepared by Cope should not have been shown to the jury" because the Turner Family "failed to establish a proper basis for its use under the standard enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)."

In response, the Turner Family cites an opinion from this Court: *Garza v. Perez*, No. 04-04-00224-CV, 2005 WL 1750100 (Tex. App.—San Antonio 2005, pet. denied). In that case, this Court explained that "[w]hen an experiment is conducted out-of-court and in the absence of opposing counsel, there must be a substantial similarity between the conditions depicted on the videotape and the actual event that is the subject of litigation." *Id.* at \*2 (citing *Fort Worth & Denver Ry. Co. v. Williams*, 375 S.W.2d 279, 281-82 (Tex. 1964)). However, this Court noted that "the conditions need not be identical." *Id.* (citing *Fort Worth*, 375 S.W.2d at 281-82). "When there is dissimilarity in the conditions, the admission of the experiment is within the trial court's discretion if the differences are minor or are explained to the jury." *Id.* The test for exclusion was whether the experiment would tend to confuse rather than aid the jury. *Id.* This Court explained that the appellants were challenging the trial court's admission of videotapes sponsored into evidence by an expert witness of the appellees. *Id.* Specifically, the appellants contended that the videos did not portray circumstances substantially similar to those of the accident and thus misled the jury. *Id.*

This Court concluded that "although the experimental conditions were not identical to those encountered by Garza, the trial court did not abuse its discretion in determining that they

were substantially similar." *Id.* According to this Court, the record reflected that the dissimilarities between the video and the occurrence, which were minor, were explained to the jury. *Id.* Further, this Court held that any error was harmless because at trial appellants "were afforded the opportunity to cross-examine the witness on any dissimilarities in the video experiment." *Id.* And, "the videotapes were not the only evidence bearing on the audibility and visibility of the train." *Id.*

First, we note that unlike in *Garza*, the animation in this case was not admitted in evidence; it was merely shown to the jury for demonstrative purposes. Additionally, we find no abuse of discretion by the trial court in determining that the use of the amination for demonstrative purposes would not confuse the jury. Like in *Garza*, JBS and Turner were afforded the opportunity to cross-examine Cope about any dissimilarities between the accident and the animation. Further, the jury had photographs of the accident scene, along with an actual real-time videotape of the accident. Thus, we find no abuse of discretion by the trial court in allowing the animation to be viewed by the jury.

Finally, JBS and Lundry argue that Cope's expert opinion testimony was conclusory or speculative and is thus not relevant evidence. At trial, Cope testified he went to the scene of the accident three times, watched the traffic at the intersection of Rittiman and Goldfield, and viewed the video and photos taken of the accident. Cope testified that Turner was hit by the 18-wheeler twenty-nine seconds after the light had changed, and that there was no doubt in his mind that the signal telling Turner she could walk was indicated. Cope testified that when he was able to inspect the actual truck driven by Lundry at the scene of the accident, he "took measurements to determine heights of mirrors and also to walk in a perimeter around the front side of the vehicle just so that [he] could determine if there were blind spots for the driver of the vehicle so that there would be areas where he wouldn't be able to see a person traveling on his right side." According to Cope, he also sat in the driver's seat of the truck "to look out and had the lawyer in this case walk out

there in the perimeter also so that [he] could determine whether [he] could see the lawyer and all of the angles to the right as if he was approaching from the area where the service station pumps were and/or the mailbox." Cope testified that as Lundry made the right turn, the biggest opening was the passenger window where he would be able to see Turner walking. Cope testified they held up a measuring stick to measure Turner's height. Cope concluded the blind spot was twenty feet. JBS and Lundry did not lodge an objection during this testimony by Cope.

According to JBS and Lundry, Cope's testimony regarding what was visible in Lundry's line-of-sight is not reliable because no actual measurements were made of Lundry's line-of-sight within the cab of the tractor as it was configured at the time of the occurrence made the basis of this lawsuit. JBS and Lundry complain that no in-cab measurements were taken and that plaintiffs' counsel, who is substantially taller than Lundry, simply pointed a camera out of the window with the lens at some unknown and undocumented height at Cope who was holding a measuring rod outside the cab some distance away. According to JBS, this methodology is flawed because it ignores the actual facts and measurements, such as Lundry's seat position and Lundry's height affecting the line of sight. JBS and Lundry further complain that Cope's methodology ignores Turner's actual position in relation to the 18-wheeler as the 18-wheeler proceeded down Rittiman Road and turned on Goldfield. JBS and Lundry argue Cope made no attempt to accurately fix the relative positions of the 18-wheeler or Turner at any point in time and that Cope ignored the constantly changing angle of the 18-wheeler throughout the turning maneuver from Rittiman onto Goldfield and ignored Turner's change in direction as she approached Goldfield. According to JBS and Lundry, Cope's opinions are not probative evidence.

In *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009), the Texas Supreme Court stated that "[b]are, baseless opinions will not support a judgment even if there is no objection to their admission in evidence." "Opinion testimony that is conclusory or speculative is not

relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'" *Id.* (quoting TEX. R. EVID. 401). "Furthermore, this Court has held that such conclusory statements cannot support a judgment even when no objection was made to the statements at trial." *Id.* Thus, "a party may complain that *conclusory opinions are legally insufficient evidence* to support a judgment even if the party did not object to the admission of the testimony." *Id.* (emphasis added). "When a scientific opinion is admitted in evidence without objection, it may be considered probative evidence even if the basis for the opinion is unreliable." *Id.* at 818. "But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Id.*

Because JBS and Lundry did not object during Cope's testimony, they cannot argue that the trial court erred in not excluding his testimony based on reliability. Instead, because they did not object to Cope's testimony, they argue that his testimony was conclusory and therefore does not constitute relevant evidence. However, in reviewing Cope's testimony, we do not find that his opinions were conclusory or speculative. Thus, we do not agree with JBS and Lundry that Cope's testimony cannot be considered relevant evidence in support of the judgment.

Moreover, even if we were to agree that Cope's opinions were conclusory and speculative, and thus could not be considered relevant evidence, there is other legally sufficient evidence in this case (besides Cope's testimony) to support the jury's findings of negligence against JBS and Lundry.

**WRONGFUL-DEATH DAMAGES**

JBS and Lundry argue the evidence is legally and factually insufficient to support the jury's award of wrongful death damages to two of Turner's three children: Sophia Lenzy and Thomas Lenzy. The jury awarded each of Turner's three children $300,000: $75,000 for loss of

companionship and society sustained in the past; $75,000 for loss of companionship and society sustained in the future; $75,000 for mental anguish sustained in the past; and $75,000 for mental anguish sustained in the future.

While both mental anguish and loss of companionship and society compensate for non-economic damages, the two elements of damages are separate and do not overlap. *Thomas v. Uzoka*, 290 S.W.3d 437, 455 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). "Mental anguish" is defined as "the emotional pain, torment, and suffering that the wrongful-death beneficiary experienced as a result of the death of her family member." *Id.* "Damages for mental anguish are intended to compensate the beneficiary for the deleterious effect that the wrongful death had on the beneficiary." *Id.* To recover mental anguish, a claimant must demonstrate "a high degree of mental suffering beyond disappointment, anger, resentment, or embarrassment." *Id.* "Thus, proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings." *Id.*

"By contrast, 'loss of companionship and society' refers to the positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have experienced had the decedent lived." *Id.* "As compared with mental anguish, which emphasizes the *negative* impact of the wrongful death on the beneficiary, loss of companionship and society focuses on the removal of *positive* benefits that the beneficiary once enjoyed but which were taken away by the wrongful death." *Id.* at 455-56 (emphasis in original).

"Although mental anguish is distinguishable from loss of companionship and society, in awarding damages for both elements, the jury may consider some of the same factors." *Id.* at 456. Those considerations include (1) the relationship between the decedent and the beneficiary; (2) the living arrangements of the parties; (3) any extended absence of the deceased from the beneficiary;

(4) the harmony of family relations; and (5) the decedent and beneficiary's common interests and activities. *Id.*

Proof of a familial relationship is "some" evidence that the surviving family members suffered mental anguish as a result of the death. *Moore v. Lillebo*, 722 S.W.2d 683, 686 (Tex. 1986) (explaining that proof of the family relationship "constitute[d] some evidence they suffered mental anguish from the wrongful death of their son" and mandated the submission of a damage issue on mental anguish). Sophia Lenzy and Thomas Lenzy are Turner's children. While JBS and Lundry stress that neither Sophia Lenzy nor Thomas Lenzy testified at trial, they did not necessarily need to testify; mental anguish evidence does not need to come from plaintiffs themselves, but can be in the form of third parties' testimony. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Here, their sister, Trinette Washington testified about how Sophia Lenzy and Thomas Lenzy were affected when they learned of their mother's death from being crushed by an 18-wheeler. Washington testified that when Thomas was told of his mother's death, he "lost it." "[E]veryone had to hover and calm him down because he just – we couldn't stop him from screaming . . . ." Washington testified that her mother's death was "the hardest" on Thomas. Washington explained that her mother's death had also "been hard on Sophia" and that Sophia was very upset about her mother's death. Washington testified that Sophia, along with the entire family, put their efforts into helping Thomas because "everybody was worried about Thomas." Washington testified, "All of our energy [was] focused on my little brother because he just kept – we couldn't stop him from screaming and so we got him to calm down and put him in the air and we all, you know, talked with him and gave him love, and we got through it." Washington testified that the two-and-a-half years since their mother's death had "been a long journey."

With respect to loss of companionship and society, JBS and Lundry argue that neither Sophia nor Thomas had had a close relationship with Turner at the time of her death. Washington,

however, testified about her siblings' relationship with their mother. Washington testified that her mother and Thomas loved each other, that even though Thomas was an adult, he was still "her baby boy." Washington characterized her brother, Thomas, as a "mamma's boy." According to Washington, it was hard for Thomas and her mother to be separated. Turner and Thomas had talked on the phone during the time he was incarcerated, and at the time of the accident, Thomas had just been released from prison. Washington also testified that Sophia and her mother loved each other. JBS criticizes the jury for awarding all three children the same amount, arguing that Sophia and Thomas did not have as close of a relationship with their mother as Washington. However, in reviewing the record, we find the jury was reasonable in awarding the same amount. There was testimony that while all three children loved their mother and were despondent when she died, they were all adults who did not see their mother on a consistent basis.

We hold that the evidence is legally and factually sufficient to support an award of mental anguish, and loss of companionship and society.

CROSS-APPEAL

*A. Survival Damages*

In their cross-appeal, the Turner Family argues that the trial court erred in failing to award them $406,316.00 in survival damages as representatives of Mary Turner. JBS and Lundry respond that they were not entitled to the damages under the survival cause of action because they lacked standing to bring an action on behalf of Turner. JBS and Lundry point to the survival statute, which provides that only a personal representative, administrator, or heir may sue on behalf of an estate. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.021(b) (West 2008). And, they emphasize that none of Turner's children in this case is a personal representative or administrator of Turner's estate. *See Shepherd v. Ledford*, 962 S.W.2d 28, 31-32 (Tex. 1998). Further, JBS and Lundry maintain that while heirs at law may have standing to bring suit on behalf of the decedent's estate, they may

only do so if they (1) allege and prove there is no administration pending, and (2) none was necessary. *See id.* According to JBS and Lundry, the Turner Family "wholly failed to plead or prove at trial that no administration was pending and none was necessary." Thus, JBS and Lundry argue that the Turner Family "never established their rights as heirs to bring the survival cause of action" and the trial court had no jurisdiction to sign a judgment in favor of the estate.

In response, the Turner Family points out that JBS and Lundry's argument is really one about *capacity* and not *standing*. The Turner Family stresses that JBS and Lundry did not challenge the Turner Family's capacity as Mary Turner's personal representative before trial through a verified answer, as required by Texas Rule of Civil Procedure 93. Thus, according to the Turner Family, because JBS and Lundry failed to file a verified answer challenging the Turner Family's capacity to bring the survival action, they waived any claim that the Turner Family could not recover survival damages based on lack of capacity.

"A plaintiff must have both standing and capacity to bring a lawsuit." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a justiciable interest in its outcome, whereas the issue of capacity is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate." *Id.* (citations omitted). "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Id.* at 848-49 (emphasis in original) (quoting *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996)).

"Although a minor, incompetent, or estate may have suffered an injury and thus have a justiciable interest in the controversy, these parties lack the legal authority to sue; the law therefore grants another party *the capacity to sue on their behalf*." *Id.* at 849 (emphasis added). "Unlike

standing, however, which may be raised at any time, a challenge to a party's capacity *must be raised by a verified pleading in the trial court*." *Id.* (emphasis added). The burden is on the defendant to challenge a plaintiff's capacity to sue, and the defendant's "failure to raise the issue of capacity through a verified plea results in waiver of that issue both at trial and on appeal." *Mariner Health Care of Nashville, Inc. v. Robins*, 321 S.W.3d 193, 200 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see* TEX. R. CIV. P. 93.

We agree with the Turner Family that the issue here is one of capacity, not standing. Because Mary Turner's estate suffered an injury, it had a justiciable interest in the controversy and thus standing. *See Lovato*, 171 S.W.3d at 849. The issue now raised by JBS and Lundry is whether the Turner Family had capacity to sue on behalf of Mary Turner's estate–that is, whether the Turner Family had the legal authority to act on behalf of the estate. However, because JBS and Lundry did not raise this issue of capacity in the trial court by verified pleading, they have waived any argument on appeal.[2] *See Mariner Health Care*, 321 S.W.3d at 202 (holding that because defendant did not file a verified pleading contesting the decedent's daughter's capacity to bring the survival action and instead waited until the close of evidence at trial to first raise the issue, the defendant waived its challenge to the daughter's capacity to bring the survival action on behalf of the estate).

Therefore, because JBS and Lundry did not properly raise the issue of capacity in the trial court, we conclude the trial court erred when it failed to include in its judgment the jury's award of $406,316.00 in survival damages.

---

[2] We note that JBS and Lundry argue in their brief that the Turner Family never pled "that they were suing in the capacity as representatives of the Estate of Mary L. Turner." We have reviewed the Turner Family's live pleading and find their petition sufficient.

*B. Mathematical Errors in Judgment*

Also in their cross appeal, the Turner Family contends the trial court's judgment incorrectly reduced the Turner Family's wrongful-death damages by $101,579.00. At a post-judgment hearing, JBS and Lundry agreed that the trial court's judgment incorrectly reduced the Turner Family wrongful death damages by $101,579.00. On appeal, JBS and Lundry do not address this argument. In reviewing the jury's verdict and the trial court's judgment, we conclude the trial court's judgment incorrectly reduced the Turner Family's wrongful death damages by $101,579.00.

Further, the Turner Family points out that the trial court's judgment (even with the incorrect amount of wrongful death damages) did not correctly calculate prejudgment interest and awarded only $1,540.00 in prejudgment interest. The Turner Family has no complaint with the rate of 5% interest, but contends the trial court incorrectly calculated prejudgment interest using that interest rate. Moreover, the Turner Family emphasizes that because the trial court's judgment did not include survival damages or the correct amount of wrongful-death damages, it does not reflect the correct amount of prejudgment interest. In reviewing the jury's verdict and the trial court's judgment, we agree with the Turner Family.

CONCLUSION

We affirm the trial court's rendering of judgment in favor of the Turner Family. However, because (1) the trial court's judgment does not include the jury's award of survival damages to the Turner Family, (2) the trial court's judgment incorrectly calculated the amount of wrongful-death damages awarded to the Turner Family, and (3) the trial court's judgment incorrectly calculated the amount of prejudgment interest, we reverse the trial court's judgment in part and remand the cause to the trial court with instructions to sign an amended judgment in conformity with this opinion. Further, because the date of the judgment will necessarily change in the amended

judgment, the trial court's amended judgment should also modify the amount of post-judgment interest.

Karen Angelini, Justice